**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Riley D. FUNCHES, Defendant–
Appellant.**

**No. 94–1419.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1995.

Decided May 20, 1996.

William J. Liscomb (argued), Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Elizabeth Cavendish–Sosinski (argued), Madison, WI, for Defendant–Appellant.

Before FLAUM, EASTERBROOK, and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

Riley D. Funches was convicted by a jury of two counts of bank robbery, in violation of 18 U.S.C. § 2113(a). Specifically, Funches was convicted of robbing a Bank One Branch and an Equitable Bank Branch, both located in Milwaukee, Wisconsin. Funches was identified prior to trial and in court by a teller

from each bank. On appeal, Funches challenges, on due process grounds, the admissibility of the in-court identifications, claiming they stemmed from out-of-court identification procedures that were suggestive and unreliable. We affirm the convictions on both counts.

## I.

On August 30, 1993, the Equitable Bank, located at 219 E. Wisconsin Avenue in Milwaukee, was robbed of $912. The robber walked up to Cherita Graham's teller window and demanded that she put money in a bag. Sitting six to seven feet behind Graham, with an unblocked view of the robber, was teller trainee Paula Holley. Graham testified at trial that, as she emptied her drawer, she concentrated on the robber "the whole time," focusing on his facial features, as she had been trained to do. Immediately after the robbery both witnesses filled out physical description forms describing the robber. Graham described the robber as 5'6"—5'9" tall, 160–170 pounds, slender, with a small build and a dark complexion. Holley described the person as 5'6"—5'9" tall, 150–160 pounds, slender, with a medium build and a medium complexion. Four days later, on September 3, 1993, both Graham and Holley were asked to view a line-up, in which Funches was *not* a subject. Teller Holley positively identified a person in this line-up as the robber. Graham, on the other hand, did not identify anyone during this line-up.

Eight days after the Equitable robbery, on September 7, 1993, the Bank One Branch at 69th and Capitol in Milwaukee was robbed of $6,888. At about 12:30 p.m. that day, teller Jacqueline Haley was standing at her station looking out of the front of the bank, which is made entirely of glass. She saw an individual walk past the glass, enter the bank, and then place a surgical-type mask over his face. Haley testified that she had a clear view of the person's face before he put the mask on. The individual walked up to her window, pulled out what looked like a black pistol, and said "clear it now." After the robber had stuffed all of the money from Haley's window into a bag, he moved to the next window,

where teller Diane Hawkinson was working. Hawkinson also emptied her teller drawer. Five hundred of the dollars taken from Haley's window was "bait money," i.e., the serial numbers of these bills had been previously recorded. When the police arrived, both Haley and Hawkinson were asked to fill out forms describing the assailant. Hawkinson admitted that she did not get a good view of the robber's face, although she did recall that he was wearing an LSU baseball cap.

Minutes after the Bank One robbery, an off-duty police officer who lived near the bank, Sergeant John Hogan, observed an individual wearing an LSU baseball cap picking up money off the street in front of his house. The person walked toward Hogan, coming within 20 feet of him. Feeling the person was acting suspiciously, Hogan made "mental notes" of the person's description. Hogan then went to the scene of the Bank One robbery and told the officers there what he had observed. The officers were also informed at the time that a person connected with the robbery was at the nearby Economy Inn. Upon arriving at the hotel, the officers were told that the suspect and a female companion had recently left by cab. A search of the room rented by the suspects revealed a jacket, shoes, and a baseball cap, which were later identified by teller Haley as the clothing worn by the robber. The officers also found an identification card bearing the name of defendant Funches and a card identifying Funches' girlfriend, Angenell Fulton. The room was apparently rented under Fulton's name.

One of the addresses recovered at the motel room led the police to Funches' mother's house. Funches and Fulton arrived at the house shortly after the police and were promptly arrested. A search of Fulton's purse yielded $4,060 in cash. Five hundred of this money was banded together in a Bank One wrapper, and the serial numbers on the bills matched those of the bait money taken earlier that day. Another $1,956 was recovered from Fulton's person, for a total of $6,016. Within an hour of the arrests, and approximately three hours and forty minutes after the robbery, the police brought Funches back to the Bank One for a show-up

procedure. The officers conducting the show-up told the two tellers that "this is a procedure that is normally conducted. Sometimes the police have the suspect, sometimes they have someone who is totally not involved." After viewing Funches through the glass front of the bank, Haley identified Funches as the robber. Hawkinson was unable to make an identification.

The following day, on September 8, 1993, another lineup was conducted for the Equitable Bank tellers and for Sergeant Hogan. This time Funches was one of the participants. Detective Jack Nehmer conducted the line-up and testified at trial as to the procedures he used. Nehmer first determined how old Funches was, how much he weighed, and how tall he was. He also examined Funches' general appearance before going to the city jail to find other subjects with similar measurements and characteristics. Based on the ages, heights, and weights reported by the line-up participants (the subjects were never measured or weighed), Funches was the oldest, the shortest, and weighed the least. According to Funches, he stood 5'5" tall and weighed 130 pounds. The other participants reportedly ranged in height from 5'8" to 5'10" and weighed between 150 to 175 pounds. Funches was also the only suspect wearing a dark green t-shirt rather than a county jail issued white t-shirt under his jumper, which they all wore.

Viewing this line-up, Equitable Bank teller Graham positively identified Funches as the robber. She based her identification on his appearance and his voice, which she heard during the line-up when Funches repeated the words of the robber. Teller Holley was unable to make a positive identification but wrote "Number 2 [Funches] looks like the suspect, but I'm not sure." Sergeant Hogan also identified Funches from the line-up as the man he had seen picking up money minutes after the Bank One robbery. He based his identification on Funches' facial features, height, build, complexion, mannerisms, and walk.

Prior to trial Funches moved to suppress the identification of teller Graham, arguing the September 8, 1993 lineup was unduly suggestive. Funches pointed to the physical dissimilarities among the participants in support of his motion. The district court denied Funches' motion, finding the dissimilarities "insignificant," and further that, even if the line-up was suggestive, Funches had not shown there was a substantial likelihood of misidentification. At trial, then, Graham identified Funches in open court as the Equitable robber and testified to her identification at the line-up. In addition, both Graham and Holley identified a photograph of the robber taken by the bank surveillance camera as the Equitable robbery occurred. Sylvia Tolar, Angenell Fulton's sister, identified the person in the photograph as Funches, whom she had known for 14 years.

As to the Bank One robbery, teller Haley, without objection, identified Funches in court and testified about her identification during the show-up procedure. Sergeant Hogan also identified Funches at trial as the man in the LSU cap he had seen picking up money on the street. Hogan additionally testified as to how he identified Funches in the September 8, 1993 line-up. The government also presented evidence that clothing found in a hotel room rented by Fulton, Funches' girlfriend, was identified by Haley as that of the robber, that identification cards for Fulton and Funches were found in the same hotel room, and that when Funches was arrested, Fulton was carrying over $6,000 in cash, $500 of which was bait money from Bank One that was banded together with a Bank One wrapper. The jury convicted Funches of both counts of bank robbery.

## II.

Funches maintains on appeal that the trial court clearly erred in denying his motion to suppress the identifications of Cherita Graham, claiming that both the in-court and out-of-court identifications stemmed from an unduly suggestive and unreliable line-up procedure. Funches also contends that it was plain error to allow Jacqueline Haley to identify Funches in court as the Bank One robber, as her identification resulted from a suggestive and unreliable show-up procedure. The admission of these tainted identifica-

tions, Funches argues, violated his right to due process.

## A.

■ We review the district court's decision to allow the identification testimony of Equitable teller Graham (stemming from the September 8, 1993 line-up) for clear error only. *United States v. Donaldson,* 978 F.2d 381, 387 (7th Cir.1992). In evaluating a challenge to identification testimony, we engage in a two-step inquiry. The defendant must first establish that the identification procedure employed was unreasonably suggestive. *United States v. Larkin,* 978 F.2d 964, 970 (7th Cir.1992), *cert. denied,* 507 U.S. 935, 113 S.Ct. 1323, 122 L.Ed.2d 709 (1993); *Donaldson,* 978 F.2d at 385; *Kubat v. Thieret,* 867 F.2d 351, 357 (7th Cir.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). If the defendant succeeds, the court must determine "whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedures." *Kubat,* 867 F.2d at 357; *see also Donaldson,* 978 F.2d at 385; *United States v. Sleet,* 54 F.3d 303, 309–10 (7th Cir.1995). "The primary evil to be avoided," in the words of the Supreme Court, "is a very substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972); *see also Donaldson,* 978 F.2d at 385; *Sleet,* 54 F.3d at 309.

■ Funches contends that in the September 8, 1993 line-up, he was the oldest, the shortest, and weighed the least of the five participants. Based on the heights and weights reported by the participants themselves, Funches was 3–5 inches shorter and 20–45 pounds lighter than the other participants. He also claims that attention was drawn to him because he was the only suspect wearing a green t-shirt under his jumper and additionally that he was the only one that could be described as having both a slight build and a dark complexion, which is how Graham described the robber. Funches argues that all of these factors, in combination, created an unreasonably suggestive line-up. Upon reviewing photographs of the lineup, the district court found the differences Funches relied upon "insignificant." Our independent assessment of the line-up photographs leads us to the same conclusion.

Regardless of their reported heights, it is clear from the pictures of the line-up that at least two of the other suspects were very close in height to Funches, while the others were not appreciably taller. Only two of the participants appear to be somewhat heavier than Funches, with bigger builds, yet the differences are not overly conspicuous, particularly since the suspects were presented in very baggy clothing. Skin color is a matter of degree, and the differences in coloring between the persons in the picture appear to be minimal. Further, such a small portion of the participants' t-shirts are even visible under the jumpers that Funches' green t-shirt does not draw any undue attention to him. Finally, the heights and weights of the other participants are within or extremely close to the range of measurements tellers Graham and Holley used in describing the robber immediately after the incident, making their selection all the more reasonable.[1] One cannot expect a line-up to consist of five persons with identical measurements and countenances. We conclude that the participants in this line-up had descriptive features within a reasonable range of similarity to each other, especially in light of the tellers' prior descriptions. The differences between the suspects "would hardly suggest to an identifying witness that [Funches] was more likely to be the culprit." *United States v. Bautista,* 23 F.3d 726, 731 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994).[2] Of course, at some point the dissimilarities among the participants in a line-up may cross the line to suggestiveness. *See, e.g., Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22

---

1. Graham described the robber as being 5 feet 6 inches—5 feet 9 inches tall and between 150 and 170 pounds. Holley described the robber as being 5 feet 6 inches—5 feet 9 inches tall and 150–160 pounds. The other line-up participants were all reportedly 5 feet 8 inches—5 feet 10 inches tall and weighed 150–175 pounds.

2. We also note that Graham's identification was based not only on Funches' appearance, but also on his voice, which of course was not affected by the make-up of the line-up.

L.Ed.2d 402 (1969). This, however, is not such a case. Thus the district court did not clearly err in allowing the identification testimony of Graham, and her testimony did not deprive Funches of a fair trial.

**B.**

 Funches did not object prior to trial or at trial to the identification testimony of Jacqueline Haley; thus we review its admission for plain error only. *United States v. Wagner*, 996 F.2d 906, 916 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 720, 126 L.Ed.2d 685 (1994). Under this standard, Funches must not only prove that the admission of the testimony was error, but also that reversal is required to prevent a "miscarriage of justice." *United States v. Olano*, 507 U.S. 725, 736–37, 113 S.Ct. 1770, 1778–80, 123 L.Ed.2d 508 (1993). We employ the same two-step inquiry described above to determine whether Haley's identification testimony should have been excluded.

 Funches asserts that the police show-up procedure used to obtain Haley's identification was unduly suggestive. A show-up "occurs when only one suspect is presented to the witness." *Armstrong v. Young*, 34 F.3d 421, 427 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1369, 131 L.Ed.2d 224 (1995); *United States v. Clark*, 989 F.2d 1490, 1495 (7th Cir.1993). Funches was brought back to the bank almost 4 hours after the robbery, via a police squad car, and was shown to Haley standing in the same place where the robber stood. Show-up procedures have been widely condemned because of their potential to render unreliable, mistaken identifications. *See Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972–73, 18 L.Ed.2d 1199 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."). A show-up is inherently suggestive because the witness is likely to be influenced by the fact that the police appear to believe the person brought in is guilty, since presumably the police would not bring in someone that they did not suspect had committed the crime. *See United States v. Watson*, 587 F.2d 365, 367 (7th Cir.1978) (recognizing inherent sug-

gestiveness of show-ups), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979); *United States v. Watkins*, 741 F.2d 692, 694 (5th Cir.1984) (same); *Allen v. Estelle*, 568 F.2d 1108, 1112 n. 7 (5th Cir.1978) (collecting cases).

We have noted, however, that show-ups may be appropriate in certain situations. *Clark*, 989 F.2d at 1495; *Armstrong*, 34 F.3d at 427. Where exigent circumstances exist, such as where the identifying witness may not survive until a line-up can be arranged, a show-up may be a proper. *See, e.g., Stovall*, 388 U.S. at 302, 87 S.Ct. at 1972–73 ("[T]he record in the present case reveals that the showing of Stovall to Mrs. Behrendt in an immediate hospital confrontation was imperative."). We have also recognized that immediate show-ups can serve other important interests. For example, show-ups "allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons." *Sleet*, 54 F.3d at 309 (quoting *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir.1987); *see also Bautista*, 23 F.3d at 730; *Frank v. Blackburn*, 605 F.2d 910, 912 (5th Cir.1979), *modified on other grounds*, 646 F.2d 902, *cert. denied*, 454 U.S. 840, 102 S.Ct. 148, 70 L.Ed.2d 123 (1981). In our view, such considerations will justify a show-up in a limited number of circumstances, such as where the police apprehend a person immediately after the crime and in close proximity to the scene. *See, e.g., Sleet*, 54 F.3d at 308–09 (suspect stopped fleeing crime scene shown to witness minutes after crime); *United States v. Watson*, 76 F.3d 4, 6 (1st Cir.1996) (same). It is always advisable, however, that show-ups be employed with restraint to avoid the suggestiveness inherent in such confrontations.

 In this case, a strong argument can be made that the show-up was impermissibly suggestive. Exigent circumstances did not exist—there was no danger of losing a key witness and no reason a line-up could not be arranged. In fact, a line-up for Sergeant Hogan and the Equitable Bank tellers was conducted the very next day. Further, we do not believe that other interests warranted the inherently suggestive procedure in this

case.[3] Finally, we do not think that informing Haley that Funches may be someone totally uninvolved reduces the suggestiveness in any meaningful way. A witness can easily reason that the police would not take the time and effort to rush a suspect over that they thought was not involved. We need not conclusively decide the issue, however, because even if the show-up was unduly suggestive, the totality of the circumstances convinces us that Haley's identification was nonetheless reliable. *See Armstrong,* 34 F.3d at 428; *Clark,* 989 F.2d at 1495; *United States v. Myers,* 892 F.2d 642, 646 (7th Cir. 1990).

The Supreme Court has identified several factors that bear on the reliability of identifications: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972); *Sleet,* 54 F.3d at 310. Haley had a clear view of the robber's entire face while he walked past the front of the building and into the bank in the middle of the day. The robber was only about 20 feet from her when he put the mask on, and he was standing directly across from her while she cleared her drawer. Haley testified that her attention was drawn to the man as he walked past the front of the bank because of the surgical mask he had around his neck. Haley's description of the robber, given minutes after the crime, was very accurate. Haley described the robber as 5 feet 4 inches, 125 pounds; Funches is 5 feet 5 inches, 130 pounds. She was "certain" that Funches was the robber when the police performed the show-up at the bank only 4 hours after the robbery. Thus, all five factors indicate that Haley's identification was reliable despite the possible suggestiveness.

■ Moreover, even if we were to conclude that the show-up was impermissibly suggestive and unreliable, Funches cannot show that admitting the identification testimony resulted in a "miscarriage of justice." *United States v. Olano,* 507 U.S. 725, 736–37, 113 S.Ct. 1770, 1778–80, 123 L.Ed.2d 508 (1993); *United States v. Kerley,* 838 F.2d 932, 937 (7th Cir.1988). Haley's identification was corroborated by more than substantial evidence. Sergeant Hogan identified Funches as the man he saw picking up money minutes after the robbery. Clothing identified as that of the robber was found in a room rented by Funches' girlfriend and in which Funches' identification card was found. And most importantly, Funches was arrested with his girlfriend, who was carrying over $6,000 in cash, $500 of which was the bait money from teller Haley's drawer. Therefore, no plain error exists, as Funches guilt "was so clear that he would certainly have been convicted" even if the identification was not admitted. *Kerley,* 838 F.2d at 937; *United States v. Baker,* 78 F.3d 1241, 1246–47 (7th Cir.1996).

For all of the foregoing reasons, Funches' convictions are AFFIRMED.

---

3. A show-up was not necessary for appearance purposes, as Funches had already altered his clothing by the time of the arrest and the police could prevent him from changing his appearance further once he was in custody. Also, the police found Funches with over $6,000, including the bait money from Bank One, and had placed him under arrest, so it is unlikely he would have been quickly released as innocent even if Haley had not been able to identify him. Further, the tellers were asked to describe the robber just minutes after the crime, so their freshest recollections were recorded. Finally, the show-up was conducted almost four hours after the crime, and Funches was not in the vicinity of the bank when he was arrested.