**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Nicholas Tyrone MOORE,
Defendant–Appellant.**

No. 96–2528.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 12, 1996.

Decided June 18, 1997.

Rehearing Denied July 16, 1997.

Gregory M. Gilmore, Patrick J. Chesley (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff-Appellee.

Ronald J. Stone (argued), Stratton & Nardulli, Springfield, IL, for Defendant-Appellant.

Before POSNER, Chief Judge, and COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Defendant–Appellant Nicholas Tyrone Moore was convicted of two counts of robbery of financial institutions in violation of 18 U.S.C. § 2113(d), and two counts of carrying a firearm during crimes of violence in violation of 18 U.S.C. § 924(c). Moore was sentenced to 86 months on each of the robberies to be served concurrently[1] and was also sentenced to 240 months on each of the counts of carrying a firearm, to be served consecutive to each other and consecutive to his other robbery sentences. Thus, over all Moore received a sentence of 566 months in prison as well as being sentenced to five years of supervised release following the period of imprisonment on each of the robbery charges and three years on each of the carrying a firearm charges, all to run concurrently with each other for a total of five years supervised release. The court also ordered Moore to pay $17,066 in restitution and $200 in special assessments. Moore appeals.

Moore argues that the district court abused its discretion in: admitting evidence of other crimes under Federal Rule of Evidence 404(b) to illustrate Moore's *modus operandi*; allowing a witness to explain his opinion on the similarity between the charged offenses and other crimes, as well as discuss a criminal's propensity to commit the same crime; denying his motion to suppress the introduction of photo array evidence which Moore contends was unduly suggestive; and, denying his severance motion to have separate trials for the charges relating to the two robberies. Finally, Moore argues that there was insufficient evidence to convict him of committing the robbery of the Sangamo Credit Union. We affirm.

## I. FACTUAL BACKGROUND

At approximately 10:00 a.m. on the morning of September 14, 1992, Moore entered Security Federal Savings and Loan ("Security"), located in Springfield, Illinois, and politely asked employees for directions to a nearby department store. After receiving the directions, Moore departed. About an hour later, at 11:00 a.m., two men wearing white Halloween-type hockey goalie masks and dark clothing burst into Security and demanded that the two tellers "give us all your money." The robbers ran behind the tellers' counter and with an assault of profane language ordered the tellers to open their cash drawers. After the employees opened the drawers, the robbers began stuffing cash into their pants pockets, as opposed to using a bag. Once the drawers had been emptied one of the robbers demanded that the vault be opened. After the vault was opened the other robber removed money from the cash box located inside the vault. The robber inside the vault instructed his partner to "blow [the] fucking brains out" of a teller who had previously stated that she did not have a key to the cash box in the vault. As a result the robber held his gun within several inches from the teller's head, but did not fire while the teller vehemently pleaded for her life. After emptying the cash box the two robbers ejected a videotape from the VCR recording the robbery and fled out the back door and ran down an alley into a residential neighborhood.

Later that day, the Springfield police located a hockey mask similar to the ones used in the robbery in a garbage can in an alley half a block from Security. Testing of this mask by the police and a Federal Bureau of Investigation ("FBI") Fingerprint Specialist revealed one of Moore's fingerprints on the mask. Three bank employees identified Moore in a photo array prior to trial and in court as the individual who entered Security the morning of the robbery and requested directions. The two employees who witnessed the robbery described the robbers as

---

1. One month of this sentence is to be served concurrently and 85 months consecutively to the unrelated sentence in No. 93–20014 for a conviction under 18 U.S.C. § 2113.

black males, one approximately six feet tall and carrying an automatic handgun, and the other robber slightly shorter.[2] Moore is African–American and 6'1" tall. Moore was also identified in a photo array by a woman who shortly after the robbery observed Moore, while walking her 12 pound peek-a-poo dog, and saw him and another male crouching in an alley a few blocks from Security. When the woman inquired as to why Moore was acting that way he replied that he was afraid of the dog. Apparently, Moore would have us believe that dogs are not man's best friend and that this 12 pound dog caused him to hide in fear.

On October 20, 1992, some five weeks after the Security robbery, at approximately 9:45 a.m., Moore entered Sangamo Credit Union ("Sangamo"), also located in Springfield, Illinois, and once again politely asked a teller for directions to a nearby shopping mall. After Patricia Henton, a teller, gave him directions he departed. Approximately 45 minutes later, at 10:30 a.m., two individuals stormed into the credit union office wearing gorilla masks, dark clothing and gloves, while carrying handguns. Upon entry they announced, replete with numerous obscenities, that they were robbing the facility. One of the robbers proceeded behind the teller counter and removed money from the teller drawers and stuffed it into his pants pockets. The other robber directed an employee to open the safe, the employee complied but the safe was found to contain no money. The robbers exited Sangamo Credit Union, one using the front door and the other the rear. The two rendezvoused at the rear of the building and ran down an alley into a residential neighborhood.

After the robbery, Patricia Henton identified Moore from both a photo array and in court, as the person who requested directions from her prior to the robbery. She also informed the FBI agent investigating this robbery, Special Agent John McAtee, "that although the robbers wore masks, one of the robbers had a very disgusting and filthy mouth" and that she thought that the photograph of Moore that she identified "was identical" to that robber. Henton and a loan officer both stated that the person who asked for directions was black, around six feet tall, and had one gold front tooth. Moore has a gold capped front tooth.

Employees of both Security and Sangamo described their businesses as small facilities, with no drive-up windows, and only three and two teller windows respectively. Sangamo did not have a security camera. Both financial institutions were located in, or close to, a residential neighborhood. During each of the robberies money was dropped to the floor while the robbers stuffed money into their pants and on neither occasion did either of the robbers make any effort to pick up the money.

## II. DISCUSSION

### A. Other Crime Evidence as Proof of Modus Operandi and Federal Rule of Evidence 404(b)

■■■■ Initially, Moore argues that the district court abused its discretion by allowing the government to admit evidence that Moore committed and was convicted of a separate bank robbery as evidence of Moore's identity and *modus operandi*.[3] Prior to the trial, the district court granted the government's motion for an order permitting the introduction of "other crime" evidence pursuant to Federal Rule of Evidence 404(b). Rule 404(b) permits the admission of evidence of other crimes for the purpose of establishing identity or *modus operandi*, however it may not be used "to prove the character of a person in order to show action

---

**2.** Although three employees observed Moore ask for directions, only two of them witnessed the robbery because the third employee was in the basement while the robbery was committed.

**3.** *Modus operandi* evidence is evidence that demonstrates a defendant's distinctive method of operation. *United States v. Smith*, 103 F.3d 600, 603 (7th Cir.1996). Although, Rule 404(b) does

not specifically enumerate *"modus operandi"* proof as an exception for admission of other crime evidence, this court has approved the introduction of *modus operandi* evidence under the "identity" exception to Rule 404(b). *See, e.g., United States v. Beasley*, 809 F.2d 1273, 1277 (7th Cir.1987).

in conformity therewith."[4] *See United States v. Briscoe*, 896 F.2d 1476, 1499 (7th Cir.1990). Use of other crimes evidence may not be used to demonstrate an individual's propensity to commit a crime. *United States v. Smith*, 103 F.3d 600, 603 (7th Cir.1996).

■ The district court allowed the admission of the other crime evidence that Moore had been convicted of committing the robbery of Wagner Credit Union ("Wagner"),[5] located in Decatur, Illinois, several months prior to the robbery of Security and Sangamo. The district court, after conducting the proper analysis, found that the similarities between the Wagner and two charged robberies "were sufficient to identify Defendant as the likely perpetrator." (R. 21 at 2–3.) Moore asserts that the similarities between the Wagner and other robberies were insufficient to conclude that a similar *modus operandi* was utilized. He further contends that any probative value from admitting this evidence was substantially outweighed by the danger of unfair prejudice to him.

The evidence admitted from the Wagner robbery demonstrated that on July 16, 1992, at approximately 8:30 a.m., Moore entered Wagner and asked for a job application. In response, an employee went to the copy machine to make a copy of the application form. After waiting a few minutes, Moore departed before receiving the job application. About half an hour later, shortly after 9:00 a.m., Moore and a partner charged into Wagner wearing dark clothes and hood-type masks, each carrying a handgun. One of the robbers jumped onto the teller counter and reached over into one of the teller drawers. The robber removed the money from the drawer and placed it into his pants pockets. Moore and his accomplice then rushed out through the front door.

Wagner had a video camera that recorded Moore asking for directions as well as his committing the robbery with an accomplice.

At trial, Moore did not object to the admission of the Wagner videotape. The employees were able to identify the robbers as being black because of the exposed skin on their arms. The size and location of Wagner was similar to that of Security and Sangamo Credit Union in that they were all small banking facilities with only two or three tellers and were located close to residential areas.

■ "We note that a trial court's decision to admit 'other acts' evidence is reversible only upon a showing that the court committed a clear abuse of discretion." *Briscoe*, 896 F.2d at 1499 (citing *United States v. Zapata*, 871 F.2d 616, 621 (7th Cir.1989)); *see Smith*, 103 F.3d at 602. This court has combined the requirements of Rule 404(b) and Rule 403 of the Federal Rules of Evidence to create a four prong test used in determining the appropriateness of using other crimes evidence:

> The evidence of the other act must 1) be directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; 2) show that the other act is similar enough and close enough in time to be relevant to the matter in issue; 3) be sufficient to support a jury finding that the defendant committed the similar act; and 4) have probative value that is not substantially outweighed by the danger of unfair prejudice.

*Smith*, 103 F.3d at 603; *see United States v. Mounts*, 35 F.3d 1208, 1214 (7th Cir.1994); *Briscoe*, 896 F.2d at 1499; *Zapata*, 871 F.2d at 620. Moore complains that the second and fourth prong of this test were not met, while the government asserts that there were sufficient similarities between the crimes to conclude that the same or very similar *modus operandi* existed.

■ We require that *modus operandi* evidence bear " 'a singular strong resemblance

---

4. In relevant part Rule 404(b) states:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

Fed.R.Evid. 404(b); *see United States v. Briscoe*, 896 F.2d 1476, 1499 (7th Cir.1990).

5. We affirmed this conviction in *United States v. Moore*, 25 F.3d 563 (7th Cir.), *cert. denied sub nom. Anderson v. United States*, 513 U.S. 939, 115 S.Ct. 341, 130 L.Ed.2d 297 (1994).

to the pattern of the offense charged,'" *United States v. Shackleford*, 738 F.2d 776, 783 (7th Cir.1984) (quoting *United States v. Jones*, 438 F.2d 461, 466 (7th Cir.1971)); *see Smith*, 103 F.3d at 603, and that the similarities between crimes be "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof," *United States v. Hudson*, 884 F.2d 1016, 1021 (7th Cir.1989) (citation omitted). In determining whether evidence is admissible as *modus operandi* we are directed to focus "'not on the dissimilarities between the charged offense and the other acts evidence, but on their common characteristics.'" *United States v. Powers*, 978 F.2d 354, 361 (7th Cir.1992) (quoting *United States v. Connelly*, 874 F.2d 412, 418 (7th Cir.1989)). Thus, we must first determine whether there are sufficient similarities between the other crime evidence and the charged crime that clearly distinguish the defendant from other criminals committing bank robberies.

Numerous commonalities between these robberies makes them "clearly distinctive from the thousands of other bank robberies committed each year." *Smith*, 103 F.3d at 603. The significant similarities between the robberies are that in all three cases: 1) two men identified as black and about six feet tall committed the robberies; 2) the crimes were committed in the morning; 3) the robbers emptied the cash drawers with little or no assistance from bank employees, instead of ordering the tellers to do it for them; 4) the money was stuffed into the robbers' pants pockets as opposed to utilizing some form of bag; 5) the robbers used hoods or masks to conceal their face; 6) the robbers wore dark clothing; 7) the targeted financial institutions were all small with no security guard or drive-up window, and were located near residential areas; 8) the robberies occurred within a few months of each other; and 9) most importantly, the robbers used a unique method of "casing" the institution prior to the robbery, which entailed Moore entering the facility approximately 30 to 60 minutes prior to the robbery and very politely asking for directions or a job application. Thus, the similarities between the Wagner armed robbery other crime evidence and the Security and Sangamo armed robberies are certainly sufficiently idiosyncratic to pass the second prong of the admissibility test.

Moore's second contention is that the fourth prong of the test is not met because the admission of the Wagner robbery was unfairly prejudicial. Although all relevant evidence against a party is inherently prejudicial, the probative value of the other crime evidence establishing a similar *modus operandi* in this case was not substantially outweighed by the danger of unfair prejudice. Moreover, the risk of unfair prejudice was lessened by the three specific instances of the court rendering limiting jury instructions stating that the evidence of the Wagner robbery was admitted solely for the purpose of determining the defendant's identity.[6] *United States v. Curry*, 79 F.3d 1489, 1497 (7th Cir.1996); *United States v. Lloyd*, 71 F.3d 1256, 1266 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2511, 135 L.Ed.2d 200 (1996); *United States v. Hubbard*, 22 F.3d 1410, 1418 (7th Cir.1994); *Briscoe*, 896 F.2d at 1517. We assume that the jury obeyed the court's instruction. *United States v. Ev-*

---

**6.** Limiting instructions with respect to the use of the Wagner evidence were given by the district court three times: while Agent McAtee was on the stand; prior to the closing argument, the jury was polled to ensure that they would follow the limiting instruction; and, in the final jury instructions that were read by the court and given to the jurors to use while deliberating.

In the first limiting instruction, while the agent was still on the stand, the court stated in part, "I specifically instruct you that you are not to consider the fact that the Defendant committed the Wagner Credit Union robbery as evidence of the Defendant's propensity to commit the robberies charged in this case, but can only be considered on the question of the Defendant's identity."

The limiting instruction that the jury was polled on stated, "I instruct you that the evidence of the robbery of the Wagner Credit Union has been admitted for a limited purpose. You may consider this evidence only on the question of the identity of the Defendant. This evidence is to be considered by you only for this limited purpose." Each juror responded that it would follow this limiting instruction. Lastly, the final jury instructions included the following limiting instruction: "You have heard evidence that the Defendant has been convicted of the armed robbery of the Wagner Credit Union. You may consider this evidence only on the question of the identity of the Defendant. This evidence is to be considered by you only for this limited purpose."

*ans,* 27 F.3d 1219, 1232–33 (7th Cir.1994); *Briscoe,* 896 F.2d at 1517. Therefore, the trial court did not abuse its discretion in admitting this evidence under Rule 404(b).

### B. *Cross–Examination and Propensity*

 Moore next argues that the district court erred in permitting the government's cross-examination of Agent McAtee, with respect to matters that related to a robber's propensity to commit additional robberies if they commit one and are not immediately apprehended by law enforcement officers. Moore asserts that this testimony was not only inadmissible but was also unfairly prejudicial. The government argues that there was no error in permitting the witness to explain the basis of his opinion because the Defendant opened the door to this line of questioning and the trial judge overruled Moore's objections for that reason. (Tr. 330 ("I think this is within the opened door".)) We review evidentiary rulings for abuse of discretion. *United States v. Godinez,* 110 F.3d 448, 455 (7th Cir.1997); *United States v. Runnels,* 93 F.3d 390, 393 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1095, 137 L.Ed.2d 228 (1997).

After the government rested its case, Moore's counsel called Agent McAtee as a witness.[7] Moore attempted, though ineffectively, to prove that the differences between the three robberies were too significant to denote a signature method of committing the crimes by asking Agent McAtee if he believed the robberies were similar and had the same *modus operandi,* thus, aiding in the establishment of the perpetrator. The following colloquy took place between Moore's attorney and Agent McAtee:

> Q. And are you of the opinion that the modus operandi utilized in the Wagner Credit Union [robbery] in Decatur is similar to that which was displayed at both [robberies] of Security Federal and Sangamo Credit Unions?
>
> A. Yes, sir, I am.

> Q. Now, let me point out a few things for you, and you tell me—first of all, is that theory based upon the fact that the same people would use a same method of operation in these things?
>
> A. Is my opinion based on that?
>
> Q. Yes, is that what the theory is?
>
> A. My opinion is based on that and a great deal more than that.

(Tr. 313.)

Moore's attorney then attempted to discredit the agent's opinion by addressing the dissimilarities that existed between the robberies. Following that line of questioning, Moore's attorney asked how the agent analyzed crimes to determine that a certain *modus operandi* existed, both generally, and specifically for this case. Agent McAtee was asked by Moore's attorney how many different robberies of financial institutions were analyzed before reaching his determination that the Wagner, Security, and Sangamo robberies exhibited the same *modus operandi.* The agent responded that based upon his knowledge, experience, and investigation of this case, that, in total, there were eight to ten robberies, including Wagner, Security, and Sangamo, that exhibited the same *modus operandi.*

The government's cross-examination that followed Moore's attorney's questioning included interrogatories that related to a robber's propensity to commit additional similar crimes based on his commission of a single crime of that nature. The following exchange took place:

> Q. And based on your experience of investigating bank robberies, have you learned *whether or not certain individuals who commit robbery will have a propensity to commit another robbery?*
>
> A. That's almost with a certainty. *That if a robber commits one bank robbery and is successful, it is only a matter of time before he is tempted to commit the second one.*

---

**7.** Agent McAtee was called by the United States earlier in the trial in order to discuss the FBI photo array containing a photograph of Moore that he showed to witnesses, and to establish fingerprint evidence against Moore. Moore conducted a cross-examination of Agent McAtee at that time.

MR. STONE: [8] May I pose an objection?

THE COURT: You may pose one, sure.

MR. STONE: I understand the theory of modus operandi and identity. I think that this evidence regarding propensity is clearly prejudicial, and I do not think the Government should be able to go into this.

THE COURT: Well, I agree with your first part. But you went into great detail concerning totality and more things similar than not, et cetera; the whole gambit around robberies of financial institutions. And I think this is within the opened door. Overruled.

Q. I believe you were—did you finish your answer?

A. I was continuing. It has been my experience that *if an individual is successful in committing one robbery, and is not apprehended very shortly after that, that it is only a matter of time before circumstances or temptation lead that person to commit additional robberies.*

*It's not uncommon, in my experience, for an individual to commit as many as eight, ten, twelve or more bank robberies before they're apprehended.* I have personally been involved in countless investigations where individuals have had that score of successful robberies before circumstances or fate trip them up and we apprehended them.

. . . .

Q. I guess what I'm getting at, you indicated to Mr. Stone that you were investigating eight to ten similar robberies as what you said the Wagner Credit Union, the Security Federal Union and the Sangamo Chapter Credit Union?

A. Yes, those robberies and others.

Q. And as part of your opinion that the modus operandi was the same for those three, did you base that upon your experience that *a robber who commits one robbery would commit another robbery?*

A. That was part of it—

MR. STONE: Same objection, Judge.

THE COURT: Wait just a moment.

MR. STONE: Would you show a continuing objection to this *propensity* type evidence?

THE COURT: Very well.

A. That certainly was part of it, but there were other circumstances, factors involved that to me play an even greater prominence in suggesting that the same individuals were responsible for all the robberies mentioned.

(Tr. 329–32 (emphasis added).)

After this prejudicial propensity testimony was elicited from the defendant's witness through the cross-examination by the prosecution, and following the lodging of a continuing objection by Moore, the witness went into a lengthy narrative that discussed robberies in addition to those of Wagner, Security, and Sangamo. Agent McAtee explained that beginning in the early Spring of 1992, the central Illinois area began to experience a series of armed robberies of small financial institutions that had numerous similarities. He further explained that after the arrest of Moore, along with his alleged accomplice for the Wagner robbery, the series of that type or robberies ceased completely.

The government acknowledged that its use of the word propensity was ill-chosen and requested that the court give the jury a limiting instruction with respect to the testimony. Moore's counsel did not take any position on the wording of this limiting instruction, except that no limiting instruction would suffice to allow Moore a fair trial. The court accepted the government's version of a proper limiting instruction and gave it to the jury immediately, while Agent McAtee was still on the stand. The limiting instruction stated,

Agent McAtee, as part of his testimony, indicated that in his experience, once a bank robber is successful in committing a bank robbery, he will commit other bank robberies. I specifically instruct you that you are not to consider the fact that the Defendant committed the Wagner Credit Union robbery as evidence of the Defendant's propensity to commit the robberies charged in this case, but can only be con-

---

**8.** Mr. Stone is counsel for Moore.

sidered on the question of the Defendant's identity.

I also instruct you that Agent McAtee's testimony was admitted for the limited purpose to explain his opinion that the modus operandi used to commit the Wagner Credit Union robbery was the same modus operandi used to commit the robberies charged in this case. Modus operandi is relevant to show the identity of the individuals who commit crimes in a unique way.

(Tr. 351.) The court, at the request of the government, also gave another specific limiting instruction on propensity and robberies of additional financial institutions (other than Wagner, Security, and Sangamo) prior to closing argument and thereafter went so far as to individually poll the jurors as to whether they could follow this instruction. Each juror responded affirmatively. Furthermore, the written jury instructions given to the jurors for deliberation included a limiting instruction that was almost identical to the others. The district court, at the request of the government, also had the testimony regarding propensity and robberies of additional financial institutions stricken from the record. The court also instructed the jurors to disregard the evidence on propensity and additional robberies in their entireties. Moore argued that no limiting instruction could cure the errors and allow him to receive a fair trial.

Moore next argues that the district court erred in permitting Agent McAtee to give propensity testimony over his objections. In response, the government relies on *United States v. Teague*, 445 F.2d 114, 118 (7th Cir.1971), which held that when a defendant opens the door to a subject he cannot complain about testimony which would not have been presented if the subject had not been raised by him on direct examination. *See also United States v. Wynn*, 845 F.2d 1439, 1443–44 (7th Cir.1988) (no plain error where postal inspector allowed to clarify his opinion when defendant opened the door to that line of questioning). The government claims that they were merely attempting to allow the witness to clarify and explain the basis of his opinion. Federal Rule of Evidence 404(b) clearly forbids the use of evidence to establish propensity in stating that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."

 Although the admission of this evidence was improper, reversal is not required so long as we are of the opinion that the error was harmless. The harmless error standard is established in Federal Rule of Criminal Procedure 52(a) which states that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." *See United States v. Lloyd*, 71 F.3d 1256, 1269 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2511, 135 L.Ed.2d 200 (1996). "'A harmful error results only if the error has a substantial and injurious effect or influence on the jury's verdict.'" *Id.* (quoting *United States v. Schoenborn*, 4 F.3d 1424, 1429 (7th Cir. 1993)). "A defendant is only entitled to a new trial if there is a reasonable possibility that the evidence had a prejudicial effect upon the jury's verdict." *United States v. Berry*, 92 F.3d 597, 600 (7th Cir.1996).

 Although we presume that the jury understood and followed the court's limiting instructions, *Briggs v. Marshall*, 93 F.3d 355, 360 (7th Cir.1996), such a presumption is not even necessary here as the district court went so far as to take the precaution of polling the jury. Based on a reading of the record in its totality, and having reviewed the three specific limiting instructions given by the court, along with the striking of testimony and polling of jurors, we are of the opinion that the admission of the improper propensity evidence did not prejudice Moore, and thus any error was at best harmless and, therefore, does not require a reversal and a new trial.

 Following the government's cross-examination of Agent McAtee involving testimony pertaining to propensity, Moore made a discovery request for the extrinsic material that the witness relied on in reaching his opinions. Moore stated that without that information he would be unable to conduct a meaningful re-examination of the wit-

ness. In response, the government stated that it did not believe that Moore was entitled to discovery at this point because Moore's counsel himself opened the door to this testimony, it was likely that such a request would involve substantial files in different states of completion, and that the request should have been made before trial. The district court denied Moore's request for discovery.[9] We review a district court's discovery decision for an abuse of discretion. *Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir.1995). "We will not reverse the court's decision absent a clear showing that the denial of discovery resulted in actual and substantial prejudice to the complaining litigant." *Id.* In this case, since the court had previously stricken the testimony regarding the eight to ten other robberies which Moore sought to obtain information about through discovery, we hold that Moore was not prejudiced by the denial of his discovery request and the district court did not abuse its discretion.[10]

## C. Admissibility of Photo Array

Moore next contends that the district court abused its discretion in denying his motion to suppress evidence of his identification from a photo array. The FBI photo array shown to witnesses consisted of six African–American males. However, the photograph of Moore was the only one that showed a man with a notched eyebrow or that had lines shaved into it. At trial it became apparent Moore's shaved eyebrow was observed by witnesses on the date of the Security robbery when he asked for directions. For this reason, Moore objected to the introduction of the photo array as being unduly suggestive and moved for its suppression. The district court overruled Moore's objection and found that the array was not unduly suggestive.[11]

Our standard of review of a district court's decision to allow identification testimony arising from the photo array is for clear error. *United States v. Funches*, 84 F.3d 249, 253 (7th Cir.1996). Although the government states that the proper standard of review is for clear error, in a footnote they also suggest that Moore waived his objection to the suggestiveness of the photo array, which would mean that the proper standard is for plain error. *Funches*, 84 F.3d at 254 (if a party fails to make an argument before or at trial, then review is only for plain error). When the government offered the photo array into evidence, Moore stated that it was subject to his cross. The district court responded that it would receive it subject to cross. Before this witness stepped down from the stand, Moore called for a sidebar discussion. In his reply brief, Moore states that he "believes that the topic of the photo array may have been discussed at that point with direction from the District Judge to make the record later when the jury was gone." Shortly after Moore's counsel completed its cross-examination of the witness he motioned for suppression of the photo array

9. The district court stated:

> And then there is one other issue here that we're going to have to—what the Government wants to do regarding this discovery on other things. Frankly, that's almost a red herring here. We are trying this case and nothing else. But whether or not Mr. Stone [Moore's attorney] desires to proceed at this time, the witness is on the stand, and this is the time for further examination, and we must move forward. There are just some things that have to give way to the shortness of life, and trials are one of them. So we have to go. (Tr. 348.)

10. Shortly after making this discovery request, Moore also made a motion for mistrial because of the propensity statements made by Agent McAtee. The district court denied this motion. As we have previously determined that the admission of the evidence was harmless the district

court decision will also not be reversed for the denial of this motion.

11. The court stated:

> I think this is not unduly suggestive at all. There are six black men, and they are all young, they all have hair, they all have at least some similar features. This is not-this is not, in the Court's estimation, anything that is suggestive or prohibitive here at all.
> These are going to vary from spread to spread. And if we had just Mr. Moore and five white men, or if we had three and three even. It seems to me that we just don't have anything like that here. This is about as close as you can get to—into general appearances.
> So no, I don't think that it's really unduly suggestive at all. And I think that it's perfectly proper. So I will admit this exhibit.... (Tr. 86.)

as unduly suggestive in proceedings held outside the presence of the jury. The district court stated that "the motion is—or the objection is overruled." However, it was not until after this ruling that the district court formally admitted the photo array. Therefore, we conclude that the objection was timely made and that the proper review is for clear error.

In determining whether the trial court committed clear error in allowing the identification testimony from the photo array we engage in a two-step analysis. *United States v. Hall*, 109 F.3d 1227, 1237 (7th Cir. 1997). The first question is whether the identification procedure used was unduly suggestive. *Id.* If it is found unduly suggestive, the identification can still be admissible so long as the testimony was reliable, given the totality of the circumstances. *Id.* at 1237–38. In assessing reliability we look to five factors: "(1) the opportunity of the witness to view the event and the actor; (2) the degree of the witness's attention; (3) the accuracy of the witness's description; (4) the witness's level of certainty; and finally, (5) the time elapsed between the crime and the identification." *United States v. Fryer*, 974 F.2d 813, 821 (7th Cir.1992). According to the Supreme Court, "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972) (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)); *see Funches*, 84 F.3d at 253.

Moore fails to pass even the first hurdle of the two-step analysis. Witnesses pertaining to the robbery of Security were shown the challenged photo array six months after the robbery. Only one of the four witnesses that identified Moore relative to the Security robbery had apparently mentioned prior to being shown the photo array that the person seeking directions had a "distinctive eyebrow." Additionally, only two of the four witnesses who identified Moore in the photo array, with respect to the person asking for directions prior to the Security

robbery, stated that he had a notched eyebrow with lines shave into it and that it was the most distinctive feature they noticed when they saw him. A third Security employee who observed Moore ask for directions also identified him in the photo array. However, this witness was neither asked, nor did she state on her own, that she recalled Moore having a distinctive or shaved eyebrow. A fourth witness who observed Moore crouching in the alley while she was walking her dog additionally identified him from the array, but made no mention of his eyebrow. Further, Patricia Henton, the bank employee who provided Moore with directions the morning of the Sangamo robbery, identified Moore from the same photo array and specifically testified that his eyebrow was not notched when she observed him.[12]

The district court correctly noted that all six of the individuals in the photo array are African-Americans, males, young, with some hair, and have "at least some similar features." Additionally, each of the individuals was clean shaven, all of the pictures were black and white glossy photos of the same size, and each photo showed the individual from the shoulders up. We agree with the district court's finding that the photo array identification was not unduly suggestive.

Further, although we need not analyze the reliability of the identification, the record clearly indicates that when Moore requested directions from the financial institution employees, they observed him for several minutes, paid attention to his appearance, gave detailed descriptions of him following the robbery, and viewed the photo array six months after the robbery took place. In fact, one of the witnesses stated that Moore's inquiry struck her as odd because, as she explained, Moore seemed to be breaking the age old rule that men don't ask for directions and, further, that there was a gas station right down the street which would have been a more typical choice than entering a bank to obtain directions.

As the Wisconsin Supreme Court stated:

> most likely have been sufficient time for the eyebrow hair to grow back.

12. The Sangamo robbery occurred about five weeks after the Security robbery, which would

"The 'totality of [the] circumstances' reference is a reminder that there can be an infinite variety of differing situations involved in the conduct of a particular lineup. The police authorities are required to make every effort reasonable under the circumstances to conduct a fair and balanced presentation of alternative possibilities for identification. The police are not required to conduct a search for identical twins in age, height, weight or facial features. If an Eskimo were to be involved in a burglary in Vernon county, it is not to be expected that the sheriff will seek to locate or send to the Arctic for tribesmen who could pass as brothers. What is required is the attempt to conduct a fair lineup, taking all steps reasonable under the 'totality of [the] circumstances' to secure such result."

*Hensley v. Carey*, 818 F.2d 646, 650 (7th Cir.1987) (quoting *Wright v. State*, 46 Wis.2d 75, 175 N.W.2d 646, 652 (1970)). We agree that, under the totality of the circumstances, the identification from the photo array was also reliable. Accordingly, the district court did not commit error in allowing the admission of the photo array identification.

On appeal, Moore asserts that the photo identification tainted the in-court identification as well, because while on the stand each witness identified him from the photo array prior to being asked to identify him in court. Unlike counsel's objection to the admission of the photo array, he failed to object to the in-court identification of Moore by witnesses at trial. It was not until Moore's brief on appeal that his counsel argued that the in-court identifications were tainted by the photo array. As Moore neither made this argument prior to, nor at trial, we review this issue for plain error only. *Funches*, 84 F.3d at 254. In order to establish plain error, Moore must demonstrate that the admission of the in-court identification was error and that reversal is required to prevent a miscarriage of justice. *Id.* We need not consider this argument as we have previously determined that the photo array was not unduly suggestive and was reliable. However, it is clear that no error or miscarriage of justice occurred here, so the plain error standard has not

been met and reversal is not required on this ground.

### D. Motion for Severance

Moore next contends that the district court abused its discretion when it denied his motion for a severance for the two counts relating to the Sangamo robbery from the two counts relating to the Security robbery. Moore asserts that the evidence identifying him as one of the robbers of Sangamo was "incredibly lacking." Moore states that trying the Sangamo robbery with the Security robbery, along with the propensity testimony of Agent McAtee and the Wagner *modus operandi* evidence, resulted in a situation where he did not receive fair and independent consideration by the jury with respect to the Sangamo robbery counts. In conclusion, Moore states that the jury allowed evidence to spillover and contaminate their consideration of the Sangamo charges resulting in actual prejudice to him, which requires that his convictions be reversed and remanded for separate trials.

The district court denied the severance motion pursuant to Federal Rule of Criminal Procedure 14,

which permits a district court judge to order separate trials "if it appears that a defendant or the government is prejudiced by a joinder of offenses ... for trial" and justice requires a severance. Fed. R.Crim.P. 14. Our decisions have consistently held that a defendant challenging a district court's denial of a severance motion must establish that he suffered "actual prejudice" resulting from the denial of the motion. In other words, he must demonstrate that without a severance he was unable to obtain a fair trial, not merely that a separate trial would have offered him a better chance for acquittal. We will overturn a district court's ruling on a Rule 14 severance motion only upon a showing of a clear abuse of discretion.

*United States v. Pulido*, 69 F.3d 192, 207 (7th Cir.1995) (internal citations and quotations omitted). "Because the balancing of the cost of conducting separate trials and the possible prejudice inherent in a single trial is best conducted by the trial court, the defen-

dant bears an extremely difficult burden of showing on appeal that the district court abused its discretion." *United States v. Moya–Gomez*, 860 F.2d 706, 754 (7th Cir. 1988). "A single trial is appropriate if 'it is within the jury's capacity, given the complexity of the case, to follow admonitory instructions and to keep separate, collate and appraise the [relevant] evidence.'" *Pulido*, 69 F.3d at 208 (quoting *Moya–Gomez*, 860 F.2d at 768 (quotation omitted)). In *Briscoe*, 896 F.2d at 1516–17, we reviewed the policy underlying Rule 14:

> "Joint trials reduce the expenditure of judicial and prosecutorial time; they reduce the claims the criminal justice system makes on witnesses, who need not return to court for additional trials; . . . . The joint trial gives the jury the best perspective on all the evidence and therefore increases the likelihood of a correct outcome."

*Id.* (quoting *United States v. Buljubasic*, 808 F.2d 1260, 1263 (7th Cir.1987) (citations omitted)).

 Moore speculates that separate trials may have improved his chances for acquittal, it is just as likely that they would also have "yielded two convictions, resulting in wasted time, effort, and judicial resources." *Pulido*, 69 F.3d at 208. The trial in this case was short, clear, and concise. The evidence was not complicated, and it was presented to the jury chronologically over two days. The Wagner *modus operandi* evidence would still be admissible in a separate trial for the Sangamo robbery, and it is highly likely that much, if not all, of the Security robbery evidence would also be admissible to show a signature method of committing robberies. Additionally, there was more than sufficient evidence to convict Moore of committing the Sangamo robbery. *See infra* Section E. The Supreme Court has held that "Rule 14 leaves the determina-

tion of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." *Zafiro v. United States*, 506 U.S. 534, 541, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993). We conclude that the district court did not abuse its discretion in denying the severance motion because Moore did not suffer actual prejudice.

 Moore also points out that although the district court stated that the jury would be instructed to consider each count separately, it failed to actually give such an instruction.[13] However, as Moore failed to suggest this instruction or object to the failure of the court to give it during the trial, this issue is reviewed for plain error. *United States v. Townsend*, 924 F.2d 1385, 1410 n. 14 (7th Cir.1991). The plain error review we use in the context of jury instructions is particularly light-handed. *United States v. Griffin*, 84 F.3d 912, 925 (7th Cir.), *cert. denied sub nom. Rux v. United States*, —— U.S. ——, 117 S.Ct. 495, 136 L.Ed.2d 387 (1996), *and cert. denied sub nom. Scurlock v. United States*, —— U.S. ——, 117 S.Ct. 536, 136 L.Ed.2d 421 (1996). "Reversals for plain error are infrequent because of the requirement that the error in the instructions be 'of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir.1987)). This standard is not met here because the absence of this jury instruction was not an error that rose to the level of probably changing the outcome of the trial.

Although the district court should have given the specific jury instruction pertaining to separate consideration of individual counts, we are convinced that after reading the jury instructions and the verdict form, and after considering them in their totality, there is no doubt that the jury was aware that it should give separate consideration to

---

**13.** In the order ruling on the motion for severance the district court stated: "[t]he jury, however, will be explicitly instructed to consider the evidence relating to each count separately and to render a separate verdict on each count." (R. 19 at 2.) A review of the record indicates that an instruction in accordance with this statement

was not given to the jury. The district court went on to say that "if the evidence pertaining to the Sangamo robbery is as legally inadequate as [Moore] claims, a contention the Government disputes, the Court will not hesitate to direct a verdict of acquittal in [Moore's] favor." (R. 19 at 2–3.)

each charged offense.[14] Accordingly, reversal is not required on this ground either.

### E. Sufficiency of the Evidence of the Sangamo Robbery

■■■ Finally, Moore argues that there was insufficient evidence to convict him of charges relating to the robbery of Sangamo. In bringing a sufficiency of the evidence challenge, Moore "faces a 'nearly insurmountable hurdle.'" *United States v. Hickok,* 77 F.3d 992, 1002 (7th Cir.) (quoting *United States v. Teague,* 956 F.2d 1427, 1433 (7th Cir.1992)), *cert. denied,* —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996). When reviewing a sufficiency of the evidence challenge "we consider the evidence in the light most favorable to the Government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.* (citations and internal quotations omitted). In determining if there was sufficient evidence we resolve all conflicts in the evidence in favor of the prevailing party. *Frazell v. Flanigan,* 102 F.3d 877, 882 (7th Cir.1996); *Emmel v. Coca–Cola Bottling Co. of Chicago,* 95 F.3d 627, 629 (7th Cir.1996).

■■■ Moore's sufficiency argument is based on his assertion that there was no physical evidence presented of his committing the Sangamo robbery, and that the only eyewitness testimony presented at trial pertained to Moore's presence in the bank prior to the robbery to ask for directions. He asserts that the jury's determination that he was one of the unidentified Sangamo robbers is nothing short of pure speculation. Moore further contends that the *modus operandi* evidence was erroneously admitted, and that the jury found him guilty of this charge because of the evidence presented pertaining to the Wagner and Security robberies. However, this argument is unpersuasive as we have previously concluded that the district court did not abuse its discretion in admitting the Wagner robbery *modus operandi* evidence or in denying Moore's motion to sever the Security and Sangamo robberies.

The record contains more than ample evidence in support of the jury's verdict. One Sangamo employee previously identified Moore as one of the robbers,[15] and also identified Moore from the photo array and in court as the person who came in and asked for directions prior to the robbery. She further testified that Moore had a gold capped tooth when he asked for directions at Sangamo. Moore has a gold front tooth and was ordered at trial to smile for the jurors. Additionally, prior to looking at the FBI photo array, she was shown two police photo displays that did not include a picture of Moore, in which she did not identify anyone. A second Sangamo employee described the person who asked for directions as a black male around six feet tall with a gold tooth in the front of his mouth. Moore had an ample opportunity to cross-examine each and every one of these witnesses. The eyewitnesses identifications were a matter presented to

---

14. The relevant parts of the jury instructions, with respect to the issue of separate consideration state:

The Government has the burden of proving beyond a reasonable doubt that the Defendant was the person who committed the crime. (Tr. of Mar. 11, 1996, at 23; R. 50.) If you find the Defendant not guilty of the crime of armed robbery of a financial institution charged in Counts 1 and 3 [Security and Sangamo Robberies] of the indictment, or if you cannot unanimously agree that the Defendant is guilty of that crime *in either count,* then you must proceed to determine whether the Defendant is guilty or not guilty of the lesser offense of robbery of a financial institution. (Tr. of Mar. 11, 1996, at 26–27 (emphasis added); R. 50.) Additionally, the jury verdict form given

to the jurors provided for a separate determination on each and every count. (R. 49.)

15. When Moore conducted his cross-examination of this witness he asked her if she recalled telling Agent McAtee at the time she viewed the FBI photo array that "although the robbers wore masks, one of the robbers had a very disgusting and filthy mouth, and she thought the black male in photograph Number 2 [Moore's photo] was identical to this person as well." (Tr. 249.) However, when testifying in court she explained that the statement was based on an assumption that she made at that time, but could no longer recall her reasoning for doing so. She also stated at trial that she was unable to identify either of the robbers who came in to Sangamo wearing masks.

the jury for them to consider, which they apparently found credible. Clearly, the record contains sufficient evidence from which the jury could have found that Moore was one of the robbers of the charged armed robberies and thus, they found him guilty beyond a reasonable doubt. *Hickok*, 77 F.3d at 1002.

 Moore is in effect asking this court to "reassess and re-weigh the evidence introduced at his trial." *Id.* at 1006. We decline this invitation because "[i]t is not the task of this appellate court to reconsider the evidence or assess the credibility of the witnesses." *United States v. Mojica*, 984 F.2d 1426, 1435 (7th Cir.1993); *see Stewart v. Duckworth*, 93 F.3d 262, 268 (7th Cir.1996) (rejecting sufficiency of the evidence claim based on credibility of identification testimony); *Griffin*, 84 F.3d at 927 ("It is for the jury—not the court of appeals—to judge the credibility of witnesses, and attacks on witness credibility are insufficient to sustain a challenge to the sufficiency of the evidence."). We will not second guess a jury on credibility issues. "We refuse to second-guess the jury's credibility determinations...." *Curry*, 79 F.3d at 1496; *see Hickok*, 77 F.3d at 1006.

 In addition to the testimony of witnesses, the jury was also presented with convincing circumstantial evidence supporting the identification of Moore as one of the robbers.

"[C]rimes [...] may be proved entirely by circumstantial evidence...." *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir.1991). Circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable. *United States v. Grier*, 866 F.2d 908, 923 (7th Cir.1989). "If the government proves its case by circumstantial evidence, it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.... The trier of fact is free to choose among various reasonable constructions of the evidence.["] *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986).[ ]

*United States v. Rose*, 12 F.3d 1414, 1420 (7th Cir.1994) (quoting *United States v. Moore*, 936 F.2d 1508, 1524 (7th Cir.1991) (internal quotes omitted)).

And while [w]e recognize that in reviewing a guilty verdict based on circumstantial evidence, we must insure that the verdict does not rest solely on the piling of inference upon inference ... neither should we view every bit of evidence in isolation. Only when the record contains no evidence, regardless of how it is weighted, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.

*Id.* (alteration in original) (quotations and citations omitted).

Moore used the same *modus operandi* as that used in the Wagner and Security robberies to commit the Sangamo armed robbery. "This circumstantial evidence, when considered in conjunction with the direct evidence, provided the basis for a reasonable factfinder to conclude beyond a reasonable doubt that [Moore] was," one of the individuals who committed the Sangamo robbery. *United States v. Balzano*, 916 F.2d 1273, 1288 (7th Cir.1990). Therefore, as Moore's sufficiency argument relies on the weight the jury gave to the eyewitnesses's identifications, we find that there was sufficient evidence to convict him of committing the Sangamo robbery, particularly when considered in conjunction with the *modus operandi* evidence that bolsters the determination that Moore committed the Sangamo robbery.

## III. CONCLUSION

We have concluded that Moore is not entitled to a new or separate trial on any of the grounds raised. The decision of the district court is AFFIRMED.