In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 06-2094

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ROBERT A. HAWKINS,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 04 CR 50028—**Philip G. Reinhard,** *Judge*.

———————

ARGUED JUNE 6, 2007—DECIDED AUGUST 28, 2007

———————

Before RIPPLE, KANNE and EVANS, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Robert Hawkins was charged with robbery affecting interstate commerce, in violation of 18 U.S.C. § 1951(a), of using a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A), and of unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Prior to trial, Mr. Hawkins moved to suppress testimony about a showup identification that had been conducted shortly after his arrest. The district court denied Mr. Hawkins' motion. After trial, a jury found Mr. Hawkins guilty on all counts, and he was sentenced to 324 months' imprisonment. He now appeals

his conviction on the ground that admission of the testimony about the showup identification violated his due process rights. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A.

On the night of March 14, 2004, Jessie Grahn was on duty as the store clerk at the Road Ranger gas station in Machesney Park, Illinois. At about midnight, a man wearing a ski mask entered the Road Ranger and robbed the store at gunpoint. He went behind the counter and attempted to open the cash register drawer himself. When he could not do so, he insisted that Grahn open it for him. Grahn did as instructed, and the robber grabbed what cash he could from the drawer, about $117, and fled. The entire incident lasted about one minute.

As soon as the robber left the store, Grahn dialed 911 to report the robbery. A dispatch went out to local law enforcement. Deputy Tom Keegan of the Winnebago County Sheriff's Department was on patrol in the area and responded to the dispatch with his lights and siren engaged.

As he neared the scene, Deputy Keegan observed a vehicle coming toward him from the opposite direction. Deputy Keegan shined his spotlight at the approaching vehicle to get it to slow down or stop. The vehicle did not slow down and appeared to accelerate. Deputy Keegan continued to shine his spotlight at the accelerating vehicle as it passed. After the vehicle passed, Deputy Keegan turned around his patrol car and pursued the other vehicle

with his light and siren still engaged. He pursued the vehicle until it stopped next to a mobile home. When Deputy Keegan reached the vehicle, he found that the driver already had fled. Other law enforcement officers joined Deputy Keegan at the site and established a perimeter.

Deputy Keegan remained at the perimeter for about ten minutes until he was relieved by another officer. He then proceeded to the Road Ranger, where he was one of the first officers to arrive. He took a description of the robber from Grahn, who described the robber as an older white man wearing dark clothes and dark gloves. She had concluded based on his voice and grey hair she saw in his eyebrows, which were visible through the ski mask, that the robber was an older man. Grahn described the robber as taller than herself and as having a medium build. Grahn further described the firearm used by the robber as small, thin and silver and not a revolver. Deputy Keegan relayed this description to the officers at the perimeter.

Back at the perimeter, the officers heard noises coming from a stand of trees near the mobile home. As the officers approached the woods, one of them noticed a small handgun on the ground near the driver's side of the vehicle which Deputy Keegan had pursued. Within ten minutes, Mr. Hawkins emerged from the woods wearing a black hooded sweatshirt, a brown leather jacket with a tear in it and jeans. He attempted to run from the police officers, but was apprehended. After searching the woods nearby, the officers found one pink glove, one gray glove, $113 in cash and a black ski mask.[1]

---

[1] The ski mask was found in the road near the area in which Mr. Hawkins was apprehended.

The officers then notified Deputy Keegan that they had a suspect in custody and that they were bringing him to the Road Ranger for a showup identification. Deputy Keegan informed Grahn that they had caught somebody, and that they wanted her to look at him. Grahn asked Deputy Keegan if the person they were bringing was the robber, to which Deputy Keegan responded that he did not know. The officers arrived at the Road Ranger with Mr. Hawkins sometime between 12:40 and 1:00 a.m., around forty minutes to an hour after the robbery. Mr. Hawkins was taken from the car without a ski mask. Grahn viewed him through the store's windows, from a distance of about 25 to 30 feet. Grahn told Deputy Keegan that Mr. Hawkins looked like the robber, but also said that she was unable to say for certain. She based her tentative identification on Mr. Hawkins' height, body type, build and clothing, which were consistent with her memory of the robber. After Grahn had identified Mr. Hawkins, she was shown the gun recovered near the vehicle Deputy Keegan had pursued. Grahn told the officers that it looked like the gun used by the robber.

Mr. Hawkins then was taken to the Winnebago County Sheriff's Department and advised of his rights. The following morning, Grahn appeared at the police station and gave a written statement.

**B.**

Mr. Hawkins was indicted for robbery affecting interstate commerce, *see* 18 U.S.C. § 1951(a), use of a firearm in relation to a crime of violence, *see id.* § 924(c)(1)(A), and unlawful possession of a firearm by a felon, *see id.* § 922(g)(1). He filed a series of pretrial motions, including

a motion to suppress Grahn's showup identification. He asserted that the showup was unduly suggestive and was unreliable under the circumstances. Therefore, Mr. Hawkins asserted, introduction of the identification into evidence would violate his due process rights.

The district court held a hearing on the motion at which Grahn and Deputy Keegan testified. At the conclusion of the hearing, that court held that introduction of testimony regarding Grahn's prior identification of Mr. Hawkins was permissible under the circumstances. The court first concluded that the showup identification was not unduly suggestive. The court noted that Mr. Hawkins had been apprehended shortly after the robbery in close proximity to the crime. The court also determined that the officers had not suggested to Grahn that the person in custody was, in fact, the robber or done anything else to influence Grahn's identification. The court further concluded that, applying the factors set forth by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972), Grahn's identification of Mr. Hawkins was reliable.

Mr. Hawkins proceeded to trial. At trial, Grahn testified about the robbery and described the robber and the gun he used. She also testified that the police had brought a man to the Road Ranger for her to identify that night. Grahn stated that the man the police brought had a similar build and appearance as the robber, but that she had not been able to say for sure that he was the robber. Grahn was not asked to identify Mr. Hawkins as either the robber or as the man the police brought to the Road Ranger on the night of the robbery. Deputy Keegan later testified that the man brought to the Road Ranger for identification was Mr. Hawkins.

In addition to the testimony of Grahn and Deputy Keegan, the Government introduced other evidence linking Mr. Hawkins to the robbery. First, the Government introduced the surveillance video from the Road Ranger on the night of the robbery. The video showed that the robber was wearing a brown leather jacket, a black hooded sweatshirt, one gray glove and one pink glove and a black ski mask. At the time Mr. Hawkins was arrested, he was wearing a brown leather jacket and a black hooded sweatshirt. Further, the gloves and ski mask recovered in the area where Mr. Hawkins was apprehended had been subjected to DNA testing. Although the results of the tests excluded between 99.9% and 99.9996% of the Caucasian population from the DNA found on each of the various items, they did not exclude Mr. Hawkins. Lastly, the Government introduced evidence that the gun recovered had been purchased by Frank Jennings, a man with whom Mr. Hawkins occasionally stayed. Mail addressed to Mr. Hawkins, as well as his wallet, were found at Jennings' home.

The jury found Mr. Hawkins guilty on all three counts, and the court sentenced him to 324 months' imprisonment.

## II

## DISCUSSION

Mr. Hawkins contends that the introduction of testimony about the showup identification violated his due process rights because the identification procedure was unduly suggestive and because the resulting identification was not reliable under the circumstances.

With respect to testimony regarding suggestive out-of-court identifications, the Due Process Clause is concerned

primarily with the substantial likelihood of misidentification. *Biggers*, 409 U.S. at 198. Thus, the Supreme Court has observed that "[t]he admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977). Therefore, to determine whether the admission of testimony regarding an out of court identification offends the defendant's due process rights, we conduct a two-step analysis. *United States v. Rogers*, 387 F.3d 925, 936 (7th Cir. 2004). First, the defendant must establish that the identification procedure was unduly suggestive. *Id.* If the defendant establishes this factor, we then must determine whether, under the totality of the circumstances, the identification was nonetheless reliable. *Id.* Although we give due deference to the district court's findings of fact, we review de novo the district court's conclusion that the introduction of the identification evidence did not violate Mr. Hawkins' due process rights. *Id.* at 931-32.

### A.

To satisfy the first prong of our analysis, the defendant must show both that the identification procedure was suggestive and that such suggestiveness was unnecessary. *See United States v. Bautista*, 23 F.3d 726, 730 (2d Cir. 1994). We previously have held that showup identifications are inherently suggestive. *United States v. Newman*, 144 F.3d 531, 535 (7th Cir. 1998). However, "the admission of evidence of a showup without more does not violate due process." *Biggers*, 409 U.S. at 198. We have recognized that showups may not be unduly suggestive under certain circumstances. *See United States v. Sleet*, 54 F.3d 303, 309

(7th Cir. 1995) (citing *Armstrong v. Young*, 34 F.3d 421, 427 (7th Cir. 1994)). To determine whether, under the circumstances, the suggestive identification was unnecessarily so, we must determine whether there was a good reason for the failure to resort to a less suggestive alternative. *See United States v. Stevens*, 935 F.2d 1380, 1383 (3d Cir. 1991) (citing 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 7.4(b), at 581 (1994)).

Our cases observe that showup identification is not unduly suggestive in cases of extraordinary urgency. *See Newman*, 144 F.3d at 535. One such extraordinary situation is confirming that an individual apprehended close in time and proximity to the scene of a crime is, in fact, the suspected perpetrator of the crime. *See United States v. Funches*, 84 F.3d 249, 254 (7th Cir. 1996); *Sleet*, 54 F.3d at 309. We have recognized that a showup identification under such circumstances serves legitimate law enforcement purposes because it allows identification of the suspect while the witness' memory is still fresh. *Sleet*, 54 F.3d at 309 (citing *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987)). Such identifications both protect innocent individuals from unnecessary arrest and help authorities determine whether they must continue to search for the actual perpetrator. *See Simmons v. United States*, 390 U.S. 377, 384-85 (1968); *Sleet*, 817 F.2d at 729. Indeed, the Supreme Court has held that the use of identification techniques akin to a showup is an appropriate method for law enforcement to employ in order to determine whether their investigation is on the right track. *See Simmons*, 390 U.S. at 384-85 (noting that showing witnesses pictures of the prime suspect in order to determine whether law enforcement is pursuing the correct suspect was a necessary method under the circumstances and comparing the technique to a showup identification).

In this case, the showup occurred less than an hour after the robbery and the defendant had been observed and apprehended in the immediate vicinity of the crime. Further, the authorities helped to minimize the suggestiveness of the procedure. When informed that a suspect had been caught, Grahn asked Deputy Keegan if it was the robber. Deputy Keegan responded that he did not know. Additionally, the officers did not present Mr. Hawkins in the ski mask found in the area of his arrest. Further, the officers did not show Grahn the gun recovered until after she had given them her opinion as to whether Mr. Hawkins was the individual who had robbed her. Lastly, although the robbery had been caught on the Road Ranger's surveillance video, Grahn had not reviewed the video prior to the showup. Taken together, these facts demonstrate that the officers took no steps other than the showup itself to suggest that Mr. Hawkins was the robber. Under these circumstances, we cannot say that the showup, while suggestive, was unduly so.

Mr. Hawkins relies on our decisions in *United States v. Funches*, 84 F.3d 249 (7th Cir. 1996), *United States v. Newman*, 144 F.3d 531 (7th Cir. 1998), and *United States v. Rogers*, 387 F.3d 925 (7th Cir. 2004), to support his argument that the procedures employed here were unduly suggestive. However, we believe that each of these cases is distinguishable in a significant way from the present case.

The defendant in *Funches* was accused of robbing a bank. The police were led to the defendant through a somewhat circuitous route. They first received a tip that someone involved in the robbery was at a nearby hotel. *Funches*, 84 F.3d at 251. When the police arrived at the hotel, they were informed that the suspect had already left by

cab with a woman. *Id.* In the course of a search of the suspect's hotel room, the police recovered an identification card with the defendant's name as well as a number of addresses, one of which was the defendant's mother's address. *Id.* The police then went to the defendant's mother's house, and the defendant arrived shortly thereafter. *Id.* Almost four hours after the robbery, the police brought the defendant back to the bank for a showup identification and had him stand in the spot where the robber had stood during the crime. *Id.* at 254. Although we did not rule definitively on whether the showup was impermissibly suggestive, we expressed concern about the use of a showup conducted almost four hours after the crime when the defendant had not been found in the vicinity of the crime. *Id.* at 255 n.3. Here, in contrast, the showup was conducted no more than an hour after the crime, and Mr. Hawkins had been found in the immediate vicinity of the Road Ranger.

In *Newman*, the defendant had robbed a bank and fled the scene. In the course of the escape, he left a trail of witnesses and destruction, which the police followed to his house. Upon arriving at the house, the police found the defendant with "a fistful of currency" along with bundles of cash bearing the stamp of the bank that had been robbed. *Newman*, 144 F.3d at 534. After arresting the defendant, the police brought several witnesses to the defendant's house after telling them they were being taken there to identify a subject. *Id.* Upon their arrival at the house, the witnesses saw the defendant in handcuffs with the house surrounded by yellow crime scene tape. *Id.* We concluded that the showup was conducted simply as a matter of convenience rather than any necessity because the police already had evidence connecting the

defendant to the robbery that rendered an expedited identification unnecessary. *Id.* at 535. In the present case, the only evidence the police had that connected Mr. Hawkins to the robbery was a general description of his clothing (dark) and physical appearance (about 5′8″ with a medium build).[2] Confirmation that Mr. Hawkins was the suspected robber was necessary in order for the authorities to determine whether they needed to continue their search for the perpetrator.

Lastly, in *Rogers*, the witness had participated in a drug transaction that involved a third person. The witness had seen that third person from a distance and did not know that person. In an effort to identify that third person, the witness previously had been shown photo arrays that included the defendant, but had not been able to identify the defendant in those photo arrays as the individual he had seen during the crime. *Rogers*, 387 F.3d at 930 & n.1. Following the witness' guilty plea related to the drug transaction, the witness had been placed in a cell with the

---

[2] Although the officers found the gun, ski mask, gloves and money in the vicinity of the vehicle which Deputy Keegan had pursued, at the time they took Mr. Hawkins to the Road Ranger, they had yet to connect Mr. Hawkins to these items in any definite way. The record reflects that each of these items was found by different officers and that each officer had left the item untouched while awaiting the crime scene investigator. None of these officers personally were responsible for apprehending Mr. Hawkins or taking him to the Road Ranger. Further, it does not appear *from the record* that the discovery of each of these items was funneled through a single command point prior to Grahn's identification so that any single individual was aware of all facts surrounding the apprehension.

defendant. At that point, the witness was able to identify the defendant as the unidentified third person. *Id.* at 937. Further, while in the cell with the defendant, the witness was interviewed by a probation officer in preparation for the witness' sentencing. *Id.* We concluded the combination of having seen the defendant's picture in a photo array and the circumstances under which the witness then encountered the defendant in the cell, may have led the witness to conclude that the presence of the defendant was not a coincidence. *Id.* In this case, there are no similarly suggestive prior events that would have led Grahn to believe that the police believed Mr. Hawkins was the robber.

Mr. Hawkins also points out that an immediate showup would not have allowed the police to release an innocent person because, at the time of the showup, the police were aware of outstanding warrants for his arrest. Therefore, he would have remained in police custody regardless of the showup. He further contends that the officers had stopped searching the area for the driver of the vehicle before the showup. Assuming the truth of this assertion, Mr. Hawkins fails to appreciate that the identification by Grahn was not necessary to establish that Mr. Hawkins was the driver of the vehicle, but rather to establish that the driver of the vehicle was the suspect in the robbery. Grahn testified that she had not seen the robber leave the scene in a vehicle. Deputy Keegan's pursuit of the vehicle had been prompted by the suspicious conduct of the driver, not by any information tying the vehicle to the robbery. Once the officers found Mr. Hawkins, there was no reason to continue searching for the driver of the vehicle. However, further information was needed to confirm that the driver of the vehicle also was the sus-

pected robber. A negative identification by Grahn would have informed the officers that, although they had apprehended the suspected driver of the vehicle, they had not necessarily apprehended the suspected robber. Thus, an identification by Grahn served the legitimate law enforcement purpose of informing the officers whether they needed to continue searching for the robbery suspect. *See Simmons*, 390 U.S. at 384-85.

Therefore, the showup identification was not unduly suggestive under the circumstances. The district court correctly allowed testimony regarding the showup identification.

**B.**

Even if we had concluded that the identification procedures were unduly suggestive, we nevertheless would conclude that, under the totality of the circumstances, the identification was reliable. When an identification procedure is unduly suggestive, we look to the totality of the circumstances to determine whether the identification was reliable despite the suggestiveness of the procedure. *Biggers*, 409 U.S. at 199. The Supreme Court has held that the factors we must consider

> in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200.

The district court found that, although Grahn's encounter with the robber had been short, she had a good opportunity to view the robber, given the lighting and the fact that she had stood next to the robber for most of the robbery. The court further found that Grahn had been attentive during the robbery, albeit frightened. The court also found that the description given by Grahn was accurate and that the showup occurred less than one hour after the robbery. These are factual findings, and we perceive nothing in the record that would cause us to question their accuracy. Further, each of these findings weighs in favor of finding that Grahn's identification of Mr. Hawkins was reliable.

Nonetheless, Mr. Hawkins asserts that the lack of certainty of Grahn's identification militates against the reliability of the identification. He notes that she did not positively identify him as the robber, but stated that he looked like the robber. The district court, on the other hand, concluded that the lack of certainty in her identification weighed in favor of reliability. The court noted that, given the fact that the robber had worn a ski mask, a more certain identification would be more suspicious.

We believe that, under the circumstances, the tentative nature of Grahn's identification does not render the identification unreliable. The district court was entitled to conclude that, given the circumstances under which Grahn viewed the robber, a more definitive answer would indicate that her identification was the product of suggestion, not her true recollection. In some circumstances, an equivocal identification may indicate a lack of reliability, but, under the circumstances here, a somewhat equivocal identification, especially when compared with the general description given by Grahn immediately after the

robbery, is consistent with the level of detail expected of the witness' memory. Here, the equivocal nature of the identification affects the weight the jury might give to the earlier identification, not the reliability of the identification itself. *See United States v. Moore*, 936 F.2d 1508, 1520-21 (7th Cir. 1991) (holding that the tentative nature of an identification affects the weight of the evidence, not its relevance or potential prejudice).

### Conclusion

The showup identification employed in this case was not unduly suggestive and, in any event, was reliable. The victim's testimony about the showup identification did not violate Mr. Hawkins' right to due process of law. The decision of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*