NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee*,

*v.*

EVAN BERDAN MUCCIARONE, *Appellant*.

No. 1 CA-CR 13-0507
FILED 06-24-2014

---

Appeal from the Superior Court in Maricopa County
No. CR2012-112984-002
The Honorable Roger E. Brodman, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Margaret M. Green
*Counsel for Appellant*

**MEMORANDUM DECISION**

Judge Patricia A. Orozco delivered the decision of the Court, in which Presiding Judge John C. Gemmill and Judge Peter B. Swann joined.

**OROZCO**, Judge:

¶1 Evan Berdan Mucciarone (Defendant), appeals from his conviction on one count of second degree burglary, a class 3 felony. He argues that: (1) the trial court abused its discretion in denying his motion to suppress a pretrial identification; (2) the trial court abused its discretion in denying his motion to suppress evidence resulting from a traffic stop; (3) fundamental error occurred because the prosecutor (Prosecutor) misstated the law in closing argument; and (4) the trial court abused its discretion when it denied his motion for mistrial based on a witness's testimony. For reasons set forth below, we affirm.

## FACTS[1] AND PROCEDURAL HISTORY

¶2 On the afternoon of March 5, 2012, Victim returned to her Sun City home and surprised Defendant and a woman (later identified as Aimee Davis or Davis), who were inside the house. Defendant was wearing a straw cowboy hat and carrying Victim's suitcase, and Davis was carrying "a black squarish thing" with a "black thing trailing down" that Victim later determined was her computer power cord. When the two ran out the front door, Victim ran after them, yelling "he's a robber." Two women who were walking in the neighborhood and observed the chase offered to call 911, and Victim decided to stop running and returned home.

¶3 Victim's neighbor (Neighbor) heard Victim yelling, and saw a man and Davis "running across the street carrying some items." Neighbor jumped in his truck and followed the two suspects. By the time he rounded the corner where the suspects had gone, Davis had "disappeared" but Defendant was still running down the sidewalk.

---

[1] We view the facts in the light most favorable to sustaining the jury's verdict and resolve all reasonable inferences against Defendant. *See State v. Vendever*, 211 Ariz. 206, 207 n.2, 119 P.3d 473, 474 n.2 (App. 2005).

Neighbor quickly caught up with Defendant and told him to "stop and turn around and go back." Defendant looked directly at Neighbor when he spoke and the two made eye contact. When Defendant "reached for something behind his back," Neighbor assumed it was a gun. Neighbor sped off to the end of the road where he made a U-turn with his truck, stopped, and observed Defendant run across the avenue and down an alleyway. Neighbor stayed where he was "a few minutes" until he saw Maricopa County Sheriff's deputies (Sheriffs) arrive on the scene. Neighbor had called 911 as he was chasing Defendant in his truck, and Sheriffs arrived within minutes of the 911 call. Neighbor flagged down the Sheriffs and reported his observations before returning to his home.

¶4        Approximately sixty to ninety minutes after the burglary, a Sheriffs' officer drove Neighbor, Neighbor's wife, and Victim to a location within two miles of their homes to view two suspects: a male and a female. Sheriffs had stopped these two in a traffic stop. Neighbor identified the male suspect, Defendant, as the man he had chased, noting "[Defendant] had the same face and the same build." Neighbor did not identify the female suspect because he never saw Davis "except from the back." Victim was also asked to identify the suspects but could not.

¶5        The State charged Defendant with burglary in the second degree, possession of burglary tools, and one count of forgery. Prior to trial, the State dismissed the charges for possession of burglary tools and forgery. The jury found Defendant guilty of burglary and also found two aggravating factors: (1) Defendant had an accomplice, and (2) the victim was over the age of sixty-five years. Defendant admitted to one prior felony conviction and that he was on probation when he committed the present crime. The trial court sentenced Defendant to an aggravated term of seven years' incarceration. Defendant timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, Arizona Revised Statutes (A.R.S.) sections 12-120.21.A.1 (2003), 13-4031, and -4033 (2010).

**DISCUSSION**

I.    Pretrial Identification of Defendant

¶6        Prior to trial, Defendant requested a *Dessureault*[2] hearing, arguing that Neighbor's pretrial identification of him on the day of the

---

[2]        *State v. Dessureault*, 104 Ariz. 380, 453 P.2d 951 (1969).

crime was suggestive and unreliable. The trial court held that, while the show up was "suggestive," Neighbor's identification of Defendant was reliable and admissible pursuant to *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). On appeal, Defendant argues that the trial court abused its discretion in admitting evidence of the pretrial identification. We disagree and find no abuse of discretion.

¶7　　　　We will not reverse a trial court's ruling on a pretrial identification absent an abuse of the trial court's discretion. *State v. Moore*, 222 Ariz. 1, 7, ¶ 17, 213 P.3d 150, 156 (2009). We consider only the evidence presented at the hearing and view it in the light most favorable to upholding the trial court's ruling. *State v. Teagle*, 217 Ariz. 17, 20, ¶ 2, 170 P.3d 266, 269 (App. 2007). We "defer to a trial court's factual findings that are supported by the record and not clearly erroneous." *Moore,* 222 Ariz. at 7, ¶ 17, 213 P.3d at 156. We review de novo the trial court's ultimate legal conclusion that the identification was reliable and admissible. *See id.*

¶8　　　　Even if a pretrial identification procedure was impermissibly suggestive, the identification may be admissible if it is nonetheless deemed reliable. *Id.* at ¶ 16. We consider the five *Biggers* factors to determine reliability of evidence. *Id.* These factors consist of: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the degree to which the witness paid attention; (3) "the accuracy of the witness's prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200; *see also Moore*, 222 Ariz. at 7, ¶ 16, 213 P.3d at 156.

¶9　　　　At the hearing, Neighbor testified that he saw Defendant running away after hearing Victim yell, "he's a robber." Neighbor immediately got in his truck and started driving alongside Defendant, telling Defendant to stop. According to Neighbor, he drove alongside Defendant, "looking right at him," for about ten seconds. He was within eight feet of Defendant while driving and "got a good look at him." Due to the height of his truck, Neighbor was "directly in eye level" with Defendant. Neighbor noticed that Defendant's shirt was "undone" and that he wore a hat. When Defendant appeared to reach behind his back, Neighbor assumed he was reaching for a gun and "sped up and went on down the street." Neighbor made a U-turn when he was about a block

away and watched Defendant "run across the street and into an alleyway." When a Sheriffs' vehicle came down the street, Neighbor contacted the Sheriff and told him where he saw Defendant go before returning home. He described Defendant as "in his 40's, 5'6" to 5'8," between 165 and 185 pounds."

¶10 Neighbor testified that approximately sixty to ninety minutes later, Sheriffs came to his home and told him either "they had a suspect" or "they had somebody they wanted [him] to look at, [and] see if he could identify." In fewer than five minutes, the deputy drove Neighbor, Neighbor's wife, and Victim to a location where Neighbor saw Davis seated on a curb and a man also seated on the curb, several feet away, with his hands behind his back. Neighbor did not see any handcuffs on the man. Sheriffs were "in the vicinity," but "five or six feet away." The Sheriff drove his patrol car slowly past the suspects, and as they were passing the male suspect, the Sheriff asked, "do you see anybody that you recognize?" Neighbor asked for "another look," and the Sheriff turned around and drove past again. Neighbor stated, "yes, that's the guy I seen run." Neighbor recognized Defendant as the man he had chased, despite the fact that Defendant no longer had "a shirt on and a hat." Neighbor did not recognize Davis. At the hearing, Neighbor stated that he experienced "no pressure" from the Sheriff to "make an identification" and that he "would have said no" had he thought Defendant was not the person he had seen. At the *Dessureault* hearing, Neighbor was unable to identify Defendant and noted that the person he chased had "maybe a week[-]old beard."[3]

¶11 The trial court found that the one-man show-up in this case was "suggestive" because no other individuals were presented to Neighbor, the Defendant was cuffed, and the Defendant was "accompanied by police officers" at the scene. On appeal, the State argues that a one-man show-up is not unnecessarily suggestive if there is a good reason for the officer's failure to resort to a less suggestive alternative. *See, e.g.*, *United States v. Hawkins*, 499 F.3d 703, 707-08 (7th Cir. 2007) (noting that show-up identification is not unduly suggestive in cases of "extraordinary urgency" that serve "legitimate law enforcement purposes" such as allowing identification of a suspect while a witness's memory is still fresh). We need not resolve the issue of whether or not the

---

[3] The record shows that, by the time of trial, Defendant was clean shaven, had gained a considerable amount of weight, and looked different than he had on the day of the crime.

trial court properly concluded that the show-up here was "suggestive" because, even assuming that it was, the trial court correctly concluded that the pretrial identification was "reliable" based on the *Biggers* factors. *See Moore*, 222 Ariz. at 7, ¶ 16, 213 P.3d at 156.

¶12 The trial court found that the first factor, opportunity to view, was satisfied because Neighbor testified that he had "eight to ten seconds" to look at Defendant, he had a good look at him, he "looked at eye level," and it was "daylight" at the time. Regarding the second factor, degree of attention, the court noted that Neighbor was "focused" on Defendant because his testimony was that he "did look at the [Defendant's] face" and also focused on the beard. The trial court found that the "level of certainty demonstrated at the time," the fourth factor, was "high" because Neighbor stated "this was the guy," and there was no evidence that suggested any uncertainty. Finally, regarding the fifth factor -- the length of time between the crime and the confrontation -- the trial court reasoned that "about an hour and a half to two hours, according to the testimony . . . is a short enough period of time to establish reliability." Both the testimony at the hearing and the reasonable inferences to be drawn therefrom support the trial court's factual findings and its legal conclusion that the identification was reliable. *See, e.g.*, *id.* at ¶ 17.

¶13 Defendant argues that because Neighbor's description of the suspect prior to the show-up, was of someone smaller and shorter than Defendant, that Neighbor's later identification was not reliable. The record shows that the trial court considered the discrepancy when it evaluated the third *Biggers* factor -- accuracy of the prior description -- and remarked that "it appeared to cut in favor of the defense['s]" arguments. Nonetheless, the trial court concluded that these inaccuracies did not undermine the identification in light of Neighbor's avowed ability to look at Defendant's face and even describe Defendant's beard. *See State v. Dixon*, 153 Ariz. 151, 154-55, 735 P.2d 761, 764-65 (1987) (finding inaccuracy in estimating height of assailant did not render subsequent identification unreliable). Whether a pretrial identification is reliable is based on the totality of the circumstances. *Biggers*, 409 U.S. at 199. In light of the evidence, we do not find that the trial court's reasoning is either unsupported or clearly erroneous. *See Moore*, 222 Ariz. at 7, ¶ 17, 213 P.3d at 156.

¶14 Defendant also argues that the approximate "two-hour" delay between the crime and the show-up rendered the pretrial identification unreliable. However, various Arizona cases have upheld

identifications that have occurred more than two hours after the crime. *See, e.g., State v. Hoskins*, 199 Ariz. 127, 138, ¶ 34, 14 P.3d 997, 1008 (2000) (identification made at show-up almost twelve hours after first encounter was fully reliable); *State v. Strickland*, 113 Ariz. 445, 448, 556 P.2d 320, 323 (1976) (ten days between witness and subsequent identification does not necessarily render identification unreliable). Therefore, the trial court did not err in finding that the two-hour time gap in this case did not render the identification unreliable. *See Moore*, 222 Ariz. at 7, ¶ 17, 213 P.3d at 156.

¶15            In addition to the *Biggers* factors, the trial court here also considered two "non-*Biggers* factors" in determining that the identification was reliable. The first was the fact that Neighbor did not affirmatively identify the female suspect at the show-up; the second was the fact that he did not identify Defendant at the hearing. According to the trial court, both of these "bolstered" Neighbor's credibility regarding his pretrial identification because "if this was a person who was simply out to identify whoever the police had around, that would have different results."

¶16            Accordingly, the trial court did not abuse its discretion in finding that the pretrial identification was reliable, even assuming a suggestive one-man show-up procedure. *See id.*

II.      Motion to Suppress/*Terry* Stop

¶17            Sheriffs stopped Defendant and Davis a little over an hour after the incident, as Defendant and Davis drove in the vicinity of the burglary. As a result of the stop, Sheriffs took Neighbor to the show-up where he identified Defendant as the person whom he had pursued. Prior to trial, Defendant filed a motion to suppress all the evidence obtained as a result of the "invalid" stop.[4] The motion was based on the Sheriff's lack of "objective evidence of a valid traffic stop." The State conceded that the stop was not based on any traffic infractions and was more consistent with a *Terry*[5] stop. Therefore, at the hearing on the motion to suppress,

---

[4]      This included the pretrial identification of Defendant as well as certain statements Defendant made to Sheriffs, based on the "Fruit of the Poisonous Tree Doctrine." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

[5]      *Terry v. Ohio*, 392 U.S. 1 (1968).

Defendant argued that Sheriffs lacked reasonable suspicion to effect a *Terry* stop. At the conclusion of the hearing, the trial court found that the deputy "possessed reasonable suspicion to stop the vehicle" and denied Defendant's motion to suppress.

**¶18** Defendant argues that the evidence at the suppression hearing does not support the trial court's conclusion that the vehicle stop was valid. He contends that the trial court consequently abused its discretion in denying his motion to suppress the evidence obtained from the stop, in violation of his Fourth Amendment rights.[6] We disagree.

**¶19** We review a trial court's denial of a Fourth Amendment motion to suppress evidence for clear error. *State v. Walker*, 215 Ariz. 91, 94, ¶ 16, 158 P.3d 220, 223 (App. 2007). We consider only the evidence presented at the suppression hearing viewed in the light most favorable to upholding the trial court's ruling. *Id.* We defer to the trial court's factual findings, including its findings on credibility and the reasonableness of inferences drawn by Sheriffs. *See State v. Moran*, 232 Ariz. 528, 531, ¶ 5, 307 P.3d 95, 98 (App. 2013). "A court's legal conclusion regarding the lawfulness of a stop is a mixed question of fact and law, which we review de novo." *Id.*

**¶20** "Under [*Terry*], a police officer may make a limited investigatory stop in the absence of probable cause if the officer has articulable, reasonable suspicion, based on the totality of circumstances, that the suspect is involved in criminal activity." *State v. Box*, 205 Ariz. 492, 497, ¶ 16, 73 P.3d 623, 628 (App. 2003); *see also Terry*, 392 U.S. at 21 (Fourth Amendment requires officers "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."); *Moran*, 232 Ariz. at 531, ¶ 4, 307 P.3d at 98 (officer must possess "a particularized and objective basis" for suspecting a particular suspect stopped had committed a crime).

**¶21** "By definition, reasonable suspicion is something short of probable cause." *State v. O'Meara*, 198 Ariz. 294, 296, ¶ 10, 9 P.3d 325, 327 (2000). While law enforcement must have more than a simple hunch or an "inchoate and unparticularized suspicion," reasonable suspicion represents a standard that is simply the "minimal level of objective justification" and is "considerably less than proof of wrongdoing by a preponderance of the evidence." *Teagle*, 217 Ariz. at 24, ¶¶ 25-26, 170 P.3d

---

6    *See* U.S. Const. amend. IV; *see also* Ariz. Const. art. 2, § 8.

at 273. "In deciding whether the police have a particularized and objective basis for suspecting that a person is engaged in criminal activity, we look at the 'whole picture,' or the 'totality of the circumstances.'" *O'Meara*, 198 Ariz. at 295, ¶ 7, 9 P.3d at 326. Furthermore, the totality of the circumstances standard permits officers to draw on their specialized training as well as on their common sense knowledge about human behavior, and to draw inferences and deductions therefrom, in forming their particularized and articulable basis for a stop. *Teagle*, 217 Ariz. at 24, ¶ 26, 170 P.3d at 273.

¶22 The evidence at the hearing established that Sheriffs received varying descriptions of the man who fled from Victim's house. One description was, "white male, approximately 6'2", 185 pounds, unshaven." One witness reported that the male suspect was wearing a cowboy hat. Davis was described as, "white with brown hair . . . up in a ponytail, brownish blond." According to witnesses, the two were fleeing on foot and were seen headed toward a river bottom area. Sheriffs also received reports concerning a suspicious white sedan "near [Victim's] home at the time of the burglary," that was driving slowly through the neighborhood. One witness "claimed she [wrote] down the license plate of the suspicious [white car]," which ultimately did not match the plate of the white vehicle Sheriffs stopped.

¶23 Sergeant F. stopped Defendant's vehicle based on the descriptions of the suspects and of the vehicle issued over his radio. Sergeant F. observed "a white female with brownish[-]blonde hair up in a pony tail" driving a white vehicle. He also observed a "white male with a beard and no shirt on" in the car. He also relied on the fact that vehicle was in "the area in which the suspects were described as running towards" as a basis for the stop. When the occupants of the vehicle drove past Sergeant F., neither made eye contact with him. The evidence also showed that Sergeant F. stopped the vehicle "less than an hour and a half" after the burglary and less than two miles from the crime scene. Moreover, the neighborhood is not a "high traffic" area. Pairing his observations and the suspects descriptions, Sergeant F. determined that he had reasonable suspicion to stop the vehicle despite the fact that its license plate number did not match to the one provided by a witness.

¶24 After considering argument, the trial court found that Sergeant F. had reasonable suspicion to stop the vehicle and detain the two occupants. The court specifically noted that "the fact that there may have been a wrong identification of a license plate" did not otherwise "detract from the facts in the officer's possession that provided him with

reasonable suspicion to stop the vehicle." It therefore ruled that the pretrial identification and statements by Defendant were admissible. We conclude the hearing evidence was sufficient to support the trial court's conclusion that the officer had "reasonable suspicion."

¶25        Defendant argues on appeal that Sergeant F.'s basis for reasonable suspicion was based on "generic, not specific information," that the descriptions were not "distinctive," that the license plate number was wrong, and that the lapse of time made Sergeant F.'s information too "stale" to give rise to reasonable suspicion. But this argument ignores the fact that reasonable suspicion is evaluated on the basis of "the whole picture." *See O'Meara*, 198 Ariz. at 295, ¶ 7, 9 P.3d at 326. While each individual factor may not, in and of itself, be sufficient to create a reasonable suspicion, when they are viewed together, along with the individual circumstances of the case and the Sheriff's reasonable deductions, they adequately contribute to find the reasonable suspicion needed to stop the vehicle. *See Teagle*, 217 Ariz. at 24, ¶ 26, 170 P.2d at 273.

¶26        Although the license plate number was not accurate, the car matched the description of the suspicious vehicle seen by several witnesses shortly after the burglary, it was stopped in the area where the suspects were seen fleeing, and the neighborhood was not one highly trafficked by vehicles. Furthermore, the description of Davis, the driver of the vehicle, while not detailed, exactly matched the description of the female suspect. While Sergeant F. may not have been able to gauge the height and weight of the male passenger, the facts that Defendant was with Davis who matched the description transmitted, in a car that matched the description transmitted, that Defendant had a beard, and that it was only a little over an hour since the burglary, all contributed to Sergeant F.'s reasonable suspicion that the two were involved in the crime and his ultimate decision to stop their vehicle. *See id.* Based on this evidence, we conclude that the trial court did not commit clear error when it denied Defendant's motion to suppress. *See Walker*, 215 Ariz. at 94, ¶ 16, 158 P.3d at 223.

III.    Prosecutorial Misconduct

¶27        Defendant asserts that Prosecutor committed misconduct in his closing rebuttal argument by misstating the law and "instruct[ing]" the jury that there was nothing "inherently wrong" with a one-on-one identification. Defendant concedes that he did not raise this argument before the trial court and that he has therefore forfeited relief on this basis on appeal unless he can establish that Prosecutor's actions constituted

fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005). Fundamental error is one that goes "to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *Id.* (internal quotation marks omitted). To prove fundamental error, Defendant must establish "both that fundamental error exists and that the error in his case caused him prejudice." *See id.* at ¶ 20.

**¶28** Prosecutorial misconduct occurs when the prosecutor intentionally engages in conduct which he knows to be improper and prejudicial and does so with indifference, if not the specific intent, to prejudice the defendant. *See State v. Martinez*, 221 Ariz. 383, 393, ¶ 36, 212 P.3d 75, 85 (App. 2009). "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Martinez*, 230 Ariz. 208, 214, ¶ 24, 282 P.3d 409, 415 (2012) (internal quotation marks omitted). We find that Prosecutor committed no misconduct here, and Defendant failed to prove that any error, let alone fundamental error, occurred in this case.

**¶29** The specific statement to which Defendant objects is when Prosecutor stated the following: "The fact of the matter is, one-on-one identification is done at the scene. There is nothing inherently wrong with it."

**¶30** This is not a misstatement of the law. While in some instances, one-on-one identifications may be "inherently *suggestive,*"[7] they are not, inevitably, "inherently *wrong*." *See State v. Hicks*, 133 Ariz. 64, 67, 649 P.2d 267, 270 (1982) (noting that recent cases have consistently held that a one-man show-up at the scene of the crime or near the time of the criminal act is permissible). Also, Prosecutor was not "instructing" the jury or making a statement of law at the time but simply arguing the facts of the case, which he was permitted to do. *See State v. Jones*, 197 Ariz. 290, 305, ¶ 37, 4 P.3d 345, 360 (2000) ("[P]rosecutors have wide latitude in presenting their closing arguments to the jury."). Hence, Defendant failed

---

[7] In fact, they even are not always "inherently *suggestive*." *See, e.g.*, *State v. Kelly*, 123 Ariz. 24, 26-27, 597 P.2d 177, 179-80 (1979) (one-man show-up is permissible when made at the scene of the crime or near the time of the crime, and the fairness of a prior identification is an issue for the trial court's determination).

to establish prosecutorial misconduct or that fundamental error, occurred in this case. *See Henderson*, 210 Ariz. at 567, ¶ 20, 115 P.3d at 607.

## IV.     Denial of Motion for Mistrial

**¶31**        Davis, the driver of the vehicle that Sergeant F. stopped and Defendant's ex-girlfriend, was called by the State as a witness.  While she was present in court on the morning of the second day of trial, she failed to return that afternoon to give testimony.  The trial court issued a bench warrant, and she was eventually brought to court and testified, albeit as a hostile witness.[8]

**¶32**        When Davis testified, she refused to answer questions directly, cursed, and claimed that her memory was vague due to past drug use.  Davis's own attorney, Defendant's counsel, and the trial court all expressed concern about Davis's refractory behavior.  Davis's counsel also expressed his concern that she might not be capable of exercising her Fifth Amendment rights.  Defendant's attorney also argued that the way she was acting and her lack of cooperation prejudiced Defendant and questioned whether she was competent to testify or "under the influence." The trial court wondered whether Davis was "currently under the influence" and eventually had her held in custody overnight and returned the following day to continue her testimony.  As a result, the trial court instructed the jury as follows:  "First of all, we saw [Davis] on the stand.  I would direct the jury to remember that you're not to guess or speculate about things and you're certainly not to discuss this case or anything that happens in this case among each other."

**¶33**        Davis again refused to testify the following day.  The State offered her immunity, but she continued to refuse to testify.  The trial court then held Davis in civil contempt but informed her that, should she change her mind, she could still testify that day and the trial court would eliminate the contempt citation.

---

8        Prior to her testimony, defense counsel objected on the grounds that he did not have an opportunity to interview her prior to trial and that he did not believe she was competent to testify.  The trial court overruled the objection at that point, stating that whether or not she was competent would be a question for the jury to resolve "in terms of whether she is credible or not."

¶34        Defendant moved for a mistrial, arguing that Davis's mannerisms, her language, and the fact that she had testified about her relationship with Defendant while initially on the stand was prejudicial to Defendant. The trial court denied the motion, finding that the evidence elicited regarding Defendant when Davis was on the stand was not prejudicial to Defendant. As far as her behavior was concerned, the trial court concluded that any problems were cured by the court's jury instruction to "disregard what happened in this particular situation." Davis testified that afternoon without further incident.

¶35        On appeal, Defendant argues that the trial court erred in denying his motion for mistrial "after [Davis] testified the first time in front of the jury while she was incompetent to testify." He also maintains that her conduct in front of the jury prejudiced his case. We are not persuaded.

¶36        A mistrial is a "most drastic" remedy that a trial court should grant only when it appears that it is the only remedy that will ensure that justice is done. *State v. Blackman*, 201 Ariz. 527, 538, ¶ 41, 28 P.3d 1192, 1203 (App. 2002). We give deference to the trial court's ruling because it is in the best position to evaluate "the atmosphere of the trial, the manner in which the objectionable statements were made, and the possible effect it had on the jury and the trial." *State v. Bible*, 175 Ariz. 549, 598, 858 P.2d 1152, 1201 (1993). Therefore, we review a trial court's ruling denying a motion for mistrial based on evidentiary concerns for an abuse of discretion. *Id.*; *Blackman*, 201 Ariz. at 538, ¶ 41, 28 P.3d at 1201. We find no abuse of discretion here.

¶37        "A witness is incompetent to testify if he or she is unable to understand the nature of an oath, or perceive the event in question and relate it to the court." *State v. Peeler*, 126 Ariz. 254, 256, 614 P.2d 335, 337 (App. 1980). A witness is not rendered incompetent merely because the witness was "under the influence of drugs" at the time of testimony. *State v. Cruz*, 218 Ariz. 149, 166, ¶ 106, 181 P.3d 196, 213 (2008). While the trial court speculated that Davis might be "under the influence" and also voiced its "serious questions . . . about her current competency," nothing in the record establishes that she was legally incompetent to testify. *See Peeler*, 126 Ariz. at 256, 614 P.2d at 337 ("It is within the sound discretion of the trial court to determine whether a witness is competent to testify."). Moreover, it appears from the record before us that the trial court was primarily concerned with Davis's "sobriety" and not her competency as a witness. It is also appears from the record that Davis understood the nature of the oath, the proceedings, and what was being asked of her by

the court. Contrary to Defendant's contention, Davis's adversarial behavior could have resulted from her clear understanding of the situation and her intent to avoid testifying. In fact, when Defendant's attorney questioned her competency, Davis stated "I know a lot more than you think I do." When the trial court threatened her with contempt, she insisted that she did not want to testify. Therefore, the trial court did not abuse its discretion by declining to find that Davis was incompetent to testify. *See Cruz*, 218 Ariz. at 166, ¶ 106, 181 P.3d at 213 ("We presume that a witness is competent to testify. A witness is not rendered incompetent to testify merely because she was under the influence of drugs at the time she testifies.") (internal quotation marks, citations, and alterations omitted).

¶38 Furthermore, the trial court did not abuse its discretion when it ruled that a jury instruction would adequately cure any prejudice that might accrue to Defendant through Davis's conduct. Contrary to Defendant's speculation, the jury was more likely to hold Davis's behavior against the State than against Defendant. The trial court here was in the best position to determine the appropriate remedy for Davis's conduct based on its assessment of the atmosphere of the trial. *See Bible*, 175 Ariz. at 598, 858 P.2d at 1201. Nothing in the record before us leads us to conclude otherwise. *See id.* The trial court therefore did not abuse its discretion when it denied Defendant's motion for mistrial.

## CONCLUSION

¶39 For the foregoing reasons, we affirm Defendant's conviction and sentence.

