2025 IL App (2d) 240672-U
No. 2-24-0672
Order filed December 29, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CM-1069 |
| KEITH C. THOMAS, | ) ) | Honorable Rene Cruz, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Trial counsel was not ineffective for failing to seek suppression of a roadside show-up identification as impermissibly suggestive, where (1) the victim had a clear view of the individual who spat on him through the window of his parked car; (2) the time between the spitting incident and the identification—roughly 80 minutes—was not unduly long; and (3) the officers involved in the show-up did nothing to increase the suggestiveness of the show-up, but in fact told the victim that the individual might or might not be the perpetrator and that the victim was not obligated to identify the individual.

¶ 2    After a jury trial, defendant, Keith C. Thomas, was convicted of battery (720 ILCS 5/12-3(a) (West 2020)) and acquitted of criminal damage to property (*id.* § 21-1(a)(1)). The trial court denied his posttrial motion and placed him on 12 months' court supervision. On appeal, defendant

contends that his trial counsel was ineffective for failing to move to suppress the results of a show-up identification by the alleged victim. We affirm.

¶ 3                                I. BACKGROUND

¶ 4     The State charged defendant with committing (1) battery, in that he knowingly and without lawful justification spat in the face of Patrick Gould and (2) criminal damage to property, in that he knowingly damaged the rear driver's side door of Gould's vehicle.

¶ 5     At trial, Gould testified as follows. On June 3, 2021, at approximately 9:45 p.m., he was driving in the left northbound lane of Randall Road. He passed a northbound maroon Ford Explorer at a traffic light at an intersection. Soon afterward, while Gould was still in the left lane, the Explorer passed him and switched to the left lane, "cut[ting] [him] off." Gould switched to the right northbound lane. About a mile north of the intersection, he saw the Explorer out of the corner of his left eye. An object came out of the Explorer's front passenger window and hit the rear driver's side door of Gould's car. Gould later discovered a dent on the driver's side that had not been there before.

¶ 6     Gould testified that he called 911 while still driving. He pulled into a Shell station and parked along the northern edge of the property, away from the gas pumps. His driver's side window was down. Gould then noticed the same vehicle he had encountered before—the maroon Ford Explorer—pull up alongside his car. The driver exited. Gould told him that the police were on the way and then began rolling the window up. The man "spit at [Gould] and as the window went up further, he punched the glass and got in his vehicle and took off." The spit landed on Gould's face. In court, Gould identified defendant as his assailant.

¶ 7     Asked what he observed at the time about defendant's appearance, Gould testified:

"Articles of clothing [I] don't remember offhand. I believe there might have been a white shirt, had a hair bandanna, a durag [*sic*]. I don't remember quite remember [*sic*] what or what you would want to call it. And there was a name tag that was about door height on my car."

¶ 8 Gould affirmed that he was able to "get a good look" at defendant and that he described him to the 911 operator, including such details as the name tag and the head covering. Later, he went with police officers and identified defendant as his assailant. When he made the identification, Gould was "positive that that was the same individual who had spit on [him]."

¶ 9 Gould stated that, at the time of the incident, his car's dashboard camera was activated. The camera was recording video of his car's interior but had lost audio-recording functionality. Gould identified People's exhibit No. 1 as the camera's video recording of the Shell station incident. Gould testified that he submitted the video to the State without altering it. When the State moved to admit the exhibit into evidence, defendant objected based on foundation because (1) the State had not "laid any foundation in terms of chain of custody or a copying process for [the video]" and (2) Gould had admitted that the camera "was not working properly at that time." The trial court granted defendant's objection and refused to admit the video.

¶ 10 On cross-examination, Gould testified that, although he viewed the video numerous times since the incident, his testimony was also based on personal recollection. The Ford Explorer cut him off about half a mile—or 45 seconds to one minute—from the traffic light. Gould knew it was the same vehicle he had passed at the light, because it "was the only other vehicle of that description at the time." When the Explorer cut him off, it did not come fully into the left lane, but it "just missed the front of [Gould's] car." After the Explorer cut him off, Gould observed the vehicle for about another 30 seconds. Gould switched to the right lane and caught up to the

Explorer. While Gould was alongside but slightly ahead of the Explorer, the object came out and hit Gould's car. This occurred about a "quarter-mile down the road" from where the Explorer had cut Gould off. Gould saw no one in the Explorer but the driver.

¶ 11    Gould was asked what he told police officers after the incident. Asked whether he mentioned to the police that the Ford Explorer's driver wore a white shirt, Gould testified, "I believe so." Asked whether he told the police that the driver wore a name tag, he testified, "Probably not."

¶ 12    Gould testified that, at the Shell station, he observed his assailant for about 30 seconds. Later, when the police brought him to view the suspect and his vehicle, he identified defendant from about 25 feet away.

¶ 13    On redirect examination, Gould testified that he switched to the right lane about one quarter-mile after the Ford Explorer cut him off. Gould did not recall which vehicle was passing the other when the object was thrown from the Explorer. At the Shell station, he told the 911 operator that his assailant was African American. Gould did not believe that his assailant was wearing a mask "when [Gould] identified [him]."

¶ 14    Jordan Rapacz, an Elgin police officer, testified as follows. On June 3, 2021, at about 9:45 p.m., he was dispatched to a Shell station on North Randall Road. There, he spoke with Gould, who pointed out the damage to his car. Gould also mentioned that he had been spat on. Rapacz did not recall whether Gould described the other vehicle involved in the incident. Rapacz left the Shell station, with Gould following. They proceeded to a show-up, which police use "to identify a possible suspect or suspect vehicle immediately after an incident." Upon arriving, Rapacz admonished Gould that the person who had been stopped (by fellow Elgin police officer Christopher Jones) "may or may not be" the person involved in the incident Gould reported, and

that Gould "was under no obligation to identify." Gould identified defendant as the driver involved in the incident.

¶ 15    On cross-examination, Rapacz testified that the show-up took place on the shoulder in the area of Randall and Big Timber Roads. It was after 10:00 p.m., and traffic was light. The weather was clear. Rapacz did not recall whether there were any streetlights in the vicinity or whether any lights from the squad cars were on. During the show-up, Rapacz and Gould stood at the rear of Rapacz's squad car, and Jones and defendant stood at the front, about 15 or 16 feet away. Defendant's vehicle was "a car length [or] five or six feet" from Rapacz and Gould, but Rapacz did not recall its make or model.

¶ 16    Jones testified as follows. On June 3, 2021, at about 9:45 p.m., he received a dispatch reporting a traffic violation on Randall Road. The dispatcher said that the caller had mentioned a "red Ford Explorer" and that he was at the Shell station. On the way there, Jones observed a red Ford Explorer driving south on Randall Road. He pulled over the vehicle, which was occupied solely by the driver, who was wearing a mask. In court, Jones identified defendant as the driver. Jones testified that, during their ensuing conversation, defendant wore "a surgical-style mask and also an identification badge." Subsequently, a show-up was arranged, and Gould identified defendant as the man who threw the object at his car.

¶ 17    Jones testified that he wore a body camera while speaking to defendant. The trial court admitted two still photographs taken by the camera. They showed an African American man wearing a dark head covering, a surgical mask pulled down just below his upper lip, a light-colored shirt, and a white identification badge. The time stamps on the photos were 10:22 p.m. and 10:24 p.m., respectively.

¶ 18    On cross-examination, Jones testified that he first encountered the red Ford Explorer near the intersection of Randall and Big Timber Roads, about one and one-half miles south of the Shell station. There were streetlights in the "immediate area" of the stop, but Jones could not remember exactly how far away they were. Traffic was "minimal." Jones stopped his squad car "maybe two car lengths" behind the Ford Explorer. Jones spoke to defendant between the two vehicles. Jones did not recall how far Rapacz's vehicle was from his vehicle during the show-up. Jones was unsure exactly where he and defendant stood "in relation to the cars" once Rapacz and Gould arrived.

¶ 19    The State recalled Gould, who testified that, at the time of incident, his dashboard camera was set up to automatically record the interior of his vehicle once the vehicle was started. Gould testified that his camera recorded the spitting incident at the Shell station. After Gould testified further, the trial court admitted People's exhibit Nos. 1 and 1A, the latter being a still image taken from the former. There was no audio. The time stamp on the still image was 9:14 p.m. The exhibits were published to the jury.

¶ 20    The video is black and white and without audio. It is approximately two minutes long, but the action relevant here occurs during the first 20 seconds. At the outset, Gould is sitting in the front passenger seat of his car. Light is coming in through the front passenger window, presumably from the service station. The area immediately outside the window is easily visible. A vehicle enters the frame and parks immediately to the right of Gould's car, facing its rear. At the three-second mark, the vehicle's front driver's side door opens. The driver's hand is seen on the inside door handle, but the rest of the driver's body is out of frame. Gould's driver's side window is open, and he speaks to the driver. After a few seconds, the driver's hand disappears from the door handle. Gould continues to speak through the window. At the 12-second mark, as Gould begins to close his window, the driver's torso and face appear at the frame's edge. The driver bends down

and spits at Gould through his window as it continues to close. The driver's face is visible from only the eyes up. He is wearing an identification badge but not a mask. After spitting, the driver punches Gould's window and disappears from the frame. The vehicle drives away at the 17-second mark. Gould wipes his face.

¶ 21    The State rested. Defendant put on no evidence. The jury found defendant guilty of battery but not guilty of criminal damage to property. The trial court denied defendant's posttrial motion and ordered him to serve 12 months of court supervision. He timely appealed.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, defendant contends that his trial counsel was ineffective for failing to move to suppress the results of the show-up identification. For the following reasons, we disagree.

¶ 24    To establish ineffective assistance of counsel, a defendant must prove that (1) his attorney's performance was objectively unreasonable and (2) it is reasonably probable that, but for counsel's unreasonable performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *People v. Colon*, 225 Ill. 2d 125, 135 (2007). Because a defendant must satisfy both prongs of the *Strickland* test, we may dispose of a *Strickland* claim on the ground that the defendant did not show prejudice, without addressing performance. *People v. Caballero*, 126 Ill. 2d 248, 260 (1989). To establish prejudice in this context, defendant must show a reasonable probability (1) that a motion to suppress the show-up would have prevailed *and* (2) that the jury would not have convicted defendant absent the show-up testimony. We hold that defendant has failed to show a reasonable probability that his motion to suppress would have succeeded. Thus, we need not consider how suppression might have impacted the result at trial.

¶ 25    "The defendant has the burden to show that a pretrial identification was impermissibly suggestive." *People v. Brooks*, 187 Ill. 2d 91, 126 (1999); *People v. Enis*, 163 Ill. 2d 367, 398

(1994). "The State may then overcome this showing by clear and convincing evidence that the witness is identifying the defendant based on his or her independent recollection of the incident." *Brooks*, 187 Ill. 2d at 126; *Enis*, 163 Ill. 2d at 398. We conclude that it is not reasonably probable that defendant would have made the threshold showing that the show-up was impermissibly suggestive. Therefore, we need not address the issue of independent recollection.

¶ 26    To meet the threshold, defendant must show that the identification was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant was] denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 302 (1967); see *People v. Hughes*, 259 Ill. App. 3d 172, 176 (1994). Suggestiveness depends on the totality of the circumstances. *Hughes*, 259 Ill. App. 3d at 176. These include especially (1) whether the witness had a clear opportunity to observe the offender during the commission of the crime (*Hughes*, 259 Ill. App. 3d at 177; see *People v. Lippert*, 89 Ill. 2d 171, 188 (1982)); (2) the length of time between the offense and the identification (*People v. Howard*, 376 Ill. App. 3d 322, 332 (2007); see *Lippert*, 89 Ill. 2d at 188); and (3) whether the officer(s) "took [any] steps other than the showup itself to suggest" that the defendant committed the offense (*United States v. Hawkins*, 499 F.3d 703, 708 (7th Cir. 2007)).

¶ 27    We conclude that it is not reasonably probable that defendant would have met his burden to show that the pretrial identification was impermissibly suggestive. The three principal criteria all militate against defendant.

¶ 28    First, at the Shell station, Gould had a clear opportunity to view his assailant. The video shows that the assailant approached Gould's car and stood within inches of him, facing him directly. The station's lights well illuminated the vicinity. Although the confrontation was not lengthy, it did not need to be for Gould to see who was at his window. While Gould's testimony

that he observed the assailant for 30 seconds at the Shell station may have been exaggerated, we conclude Gould had ample time and near-ideal conditions to view the assailant.

¶ 29 Moreover, the Shell station was not Gould's only opportunity to view the assailant and the maroon Ford Explorer. According to Gould, the assailant arrived at the Shell station in a maroon Ford Explorer. Gould had prior encounters with a vehicle of the same make, model, and color, minutes before. He first saw such a vehicle stopped at a traffic light. A short time later, a vehicle of the same description passed him and cut him off. Gould believed it was the same vehicle he had seen earlier, because there were no other vehicles of that description in the area at the time. After being cut off, Gould switched lanes and, shortly later, saw the same maroon Ford Explorer alongside him. An object was thrown from the Explorer and hit Gould's car. These encounters gave Gould opportunities to observe the Explorer's driver and observe that there was no one else in the Explorer. Also, Jones testified that defendant was stopped while driving a red Ford Explorer, and defendant was alone in the vehicle. Both Jones and Rapacz testified that traffic was light that evening. It is not reasonably probable that two solo drivers of two maroon Ford Explorers confronted Gould in an antagonistic way, without seeming provocation, a few miles apart on the same road on a low-traffic evening.

¶ 30 Second, the interval between the spitting incident and the show-up was not overly long. We recognize that, although Gould testified that he first encountered the maroon Ford Explorer on Randall Road at 9:45 p.m. (or slightly afterward), the time stamp on the still photo from People's exhibit No. 1 placed the spitting incident about 30 minutes earlier. We assume for our analysis that the still photograph controls.

¶ 31 Rapacz and Jones were both dispatched to the Shell station on Randall Road at 9:45 p.m.; Jones was en route when he stopped defendant. Jones took photographs of defendant that were

time-stamped 10:22 p.m. and 10:24 p.m. Nothing suggests more than a minimal delay between (1) Gould's arrival at the Shell station and (2) Gould's presence at the show-up scene.

¶ 32 Thus, the evidence shows that the spitting incident took place no earlier than 9:14 p.m. and that the show-up took place a few minutes after 10:24 p.m. On the brief ride back from the show-up to the Shell station, Gould specified to Rapacz that defendant was the man who spat on him.

¶ 33 At most, approximately 80 minutes elapsed between the spitting incident and the identification. This was not a long delay under the circumstances. See, *e.g.*, *Lippert*, 89 Ill. 2d at 188 (lapse of no more than 55 minutes between crime and show-up was "relatively short time" and supported admission of show-up identification); *Hawkins*, 499 F.3d at 705, 708-09 (delay of 40 minutes to an hour not problematic as the defendant had been apprehended in immediate vicinity of crime).

¶ 34 Finally, there is no evidence that either officer made the show-up any more suggestive than it inherently was. A sole police officer accompanied defendant. The other officer stood with Gould at a reasonable distance of 15 or 16 feet away. There is no evidence that defendant was forcibly restrained.[1] The officers did not try to influence Gould. Rather, Rapacz testified that he specifically instructed Gould that the person he would view at the show-up "may or may not be" the offender and that Gould "was under no obligation to identify." See *Hawkins*, 499 F.3d at 708 (when the complaining witness asked the officer whether the person being brought to the show-up

---

[1]Although defendant was wearing a mask when Rapacz stopped him, defendant had pulled the mask down below his chin while they conversed outside their vehicles. Nothing in the record suggests— and defendant does not assert—that the officers permitted him to wear a mask to obstruct his face during the show-up.

was the offender, the officer responded that he did not know). During the show-up, Gould positively identified defendant as the perpetrator.

¶ 35 We note that defendant's acquittal on the charge of criminal damage to property has no bearing on our conclusion that nothing in the record suggests that Gould identified defendant as the perpetrator of the battery under impermissibly suggestive circumstances. Defendant has failed to satisfy *Strickland*'s prejudice prong, and thus his ineffective-assistance claim fails.

¶ 36                                          III. CONCLUSION

¶ 37 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 38 Affirmed.